THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEE ROBIN, Defendant-Appellant.

First District (4th Division)   No. 1—93—0341

Opinion filed June 30, 1994.

Josette Skelnik, of Law Offices of Josette Skelnik, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Margaret M. Regan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

On August 13, 1988, defendant, Lee Robin, was indicted for the murders of his wife, Annette, and their infant daughter, Denise. The trial court ordered him examined for fitness to stand trial and for sanity. Defendant was later found unfit to stand trial and placed in the custody of the Illinois Department of Mental Health (hereinafter the Department) for treatment on an inpatient basis. Shortly thereafter, defendant was admitted to Elgin Mental Health Center (hereinafter Elgin). Six months later, defendant was determined fit to stand trial and was ultimately found not guilty of the murders by reason of insanity. The trial court ordered him examined to ascertain whether he required additional mental health services. Defendant was involuntarily committed to Elgin where he remains.

Approximately two years after he was committed, the Department filed a petition seeking unsupervised off-grounds passes for defendant. Defendant had already been granted unsupervised on-grounds passes and supervised off-grounds passes. After a hearing, the trial court denied the Department's petition and defendant was remanded to Elgin and to the custody of the Department.

On appeal, defendant contends that the trial court's order denying the Department's petition to grant him unsupervised off-grounds passes was against the manifest weight of the evidence or, alternatively, a new hearing should be conducted on the petition as the trial court's decision was based on an improper standard.

We affirm.

The record evinces that in 1979, while in college, defendant dropped out of school because he began to feel overwhelmed, extremely depressed, and anxious. He eventually finished college and entered medical school. During this period, he suffered from anxiety, self-doubt, and depression. He was hospitalized for depression for 1 1/2 weeks. After his marriage and graduation from medical school, de-

fendant again experienced extreme depression and became suicidal. He was hospitalized for three weeks.

One year prior to the murders, defendant experienced a series of depressive episodes which included paranoid delusions, ideas of reference, feelings of complete worthlessness, and suicidal ideation or intent. He shared his suicidal thoughts with his family. A week before the killings, he unsuccessfully attempted suicide and was briefly hospitalized. He was later released from the hospital and told his psychiatrist that he had thoughts of killing his wife and child. He pleaded with his wife to take their daughter and leave him but she remained.

Members of defendant's family also suffered from mental illness. Defendant was very close to his father, who was a manic depressive prone to violent periods. His brother also suffers from "schizoaffective disorder," another type of mental illness. Defendant was not close to his mother and found her to be very controlling and very demanding. He was considerably upset by his mother's tremendous dependence upon him. He directly compared his mother and his wife.

At the hearing in November 1992, the State presented substantial evidence in support of denying the Department's petition. Dr. Henry W. Lahmeyer, a professor of psychiatry at Northwestern University Medical School, testified as an expert in forensic psychiatry. Dr. Lahmeyer, who conducted the most recent evaluation of defendant, stated that it would be "premature" to grant him unsupervised off-grounds passes. This opinion was based on a review of Elgin's records, police reports, testimony from the trial, and defendant's psychiatric and psychological records in addition to his interview with defendant and some of defendant's doctors. Dr. Lahmeyer diagnosed defendant as having "bipolar type 2," a manic depressive illness with mixed personality disorders.

Dr. Lahmeyer was asked to individually evaluate each report completed on defendant. The first, based on psychological testing conducted by a doctor at Elgin, indicated that defendant suffered from paranoid and obsessive-compulsive tendencies. He was also very defensive. Dr. Mary Catherine Hughes, a Department doctor, completed a psychological report which demonstrated findings similar to those of the Elgin doctor. However, she emphasized defendant's overt and covert hostility and his inability to deal with both his hostility and violent feelings.

The findings of a doctor at the Isaac Ray Center were consistent with the other two reports as far as defendant's paranoia, difficulty with interpersonal relationships, unresolved issues of dependency, and a tendency to "act out" when issues of dependency arose. His

paranoia created difficulties in establishing psychotherapeutic trust and he found psychotherapy to be threatening. The report also noted that defendant tended to externalize the blame for his problems and has very little insight into them. The final psychological report reviewed by Dr. Lahmeyer was conducted by a doctor at the Illinois Psychiatric Institute. This doctor's findings were also consistent with the others, but he believed defendant still had psychotic potential and was a danger to himself. He did not recommend a change in defendant's privileges.

Dr. Lahmeyer observed that defendant was unable to handle closeness with other individuals. He described an incident in which defendant developed a very close friendship with a female patient at Elgin. They talked frequently and engaged in activities together. The staff saw great improvements in defendant resulting from this relationship. Defendant believed he would marry the woman once they were both released. The woman was eventually discharged and she remarried her ex-husband. Defendant became extremely upset and demanded to have his lithium level increased. Shortly thereafter, a telephone call was made to defendant from a woman he was scheduled to meet that day, presumably the aforementioned woman. A patient, a disorganized schizophrenic, answered the call and told the woman that defendant could not come to the telephone. Defendant overheard this and began shouting obscenities at the man, picked him up by the collar and began to shake him. Although this outburst only lasted 15 to 20 seconds, Dr. Lahmeyer found it significant because it was "very related to loss of a dependent relationship, another rejection." The doctor believed defendant's behavior was part of a recurring problem which remains untreated.

Regarding the murders of his wife and daughter, Dr. Lahmeyer believed defendant has "a little bit of insight" as to what he had done but it is so minimal as not to be noteworthy. Defendant blamed "a biological depressive state" for the killings and believed that the lithium has corrected any problems he had in the past. He explained: "I was sick then. I'm well now with lithium." He seemed unconcerned with the fact that he had periods of illness while taking lithium. Dr. Lahmeyer noted that "Lithium does not prevent violence." According to Department records, violence was not an issue explored with defendant. When defendant experienced violent outbursts at Elgin, his lithium level was simply increased.

Dr. Lahmeyer stated that "history is the best predictor of future behavior" and defendant's history is characterized with the repeated start of treatment which constantly failed. He believed defendant's violence was not related to psychopathology as he had thoughts about

hurting his wife approximately one year before he killed her. He also had recurring suicidal thoughts. Dr. Lahmeyer found defendant to possess all of the demographic characteristics of future violent behavior: a young male with no money and a violent past.

The State next presented the testimony of Dr. Syed Ali, an expert in forensic psychiatry and also the former supervising psychiatrist at Elgin responsible for treating patients who were found not guilty by reason of insanity. Dr. Ali reviewed defendant's records to determine whether it was appropriate to grant him unsupervised off-grounds passes and prepared a written report discussing his conclusions.

Dr. Ali believed that defendant should not be given the passes. He based this opinion on the "inadequacies" of defendant's treatment. He stated that the reasons defendant committed the murders were unexplored at Elgin. Further, Elgin failed to include defendant's history of violence and aggression in addition to his prior hospitalizations in its assessment of defendant's condition. He found it significant that three incidents of violent or aggressive tendencies occurring at Elgin were never processed or investigated from a psychiatric or psychological viewpoint. Dr. Ali, like Dr. Lahmeyer, believed that past violence is a predictor of future violence. Dr. Ali's review of defendant's records, both after he was found not fit to stand trial and after he was found not guilty by reason of insanity, revealed no reference to defendant's prior hospitalizations.

Dr. Ali also believed that defendant was diagnosed incorrectly because "major depression" did not sufficiently explain defendant's symptoms and behavior. Both defendant's father and brother suffer from mental illnesses, manic depressive illness and schizophrenia, respectively. Dr. Ali stated that manic depressive illness is hereditary and that it is treated with lithium. According to the Physician's Desk Reference, lithium is not used to treat major depression. Defendant's records indicated that when his lithium level was decreased or discontinued, his symptoms worsened to a considerable degree. Dr. Ali believed that as lithium was the medicine which had the primary curative effect, defendant was more likely to have a bipolar disorder or a manic depressive illness than major depression.

Regarding dangerousness, Dr. Ali believed the issue had not been adequately addressed by Elgin and defendant's potential for violence consequently remained. In fact, he agreed that defendant's behavior at Elgin was highly dangerous and that his previous history and treatment must be evaluated further in order to address the dangerousness issue. Defendant has never been able to offer an explanation as to why he killed his wife and infant daughter, as to why he attempted suicide one week before the killings, and as to the

fact that he was expressing urges to harm his wife and daughter to a psychiatrist during this time. Further, the underlying reasons why defendant killed his family were never identified at Elgin. This issue, according to Dr. Ali, is an essential aspect in defendant's treatment and must be addressed.

Defendant's psychosis is also unexplored and his propensity for violence thus remains. Dr. Ali characterized the care at Elgin as being "insufficient" in addressing the probability for future dangerousness. He opined that "if [defendant] were in a situation where he's becoming more responsible for himself, *** it might put more pressure [on him], given the fact that the underlying reasons for the aggressive tendencies *** may *** have not been addressed." Ultimately Dr. Ali concluded, based upon a reasonable degree of medical certainty, that defendant should not be given the "privilege" of unsupervised off-grounds passes.

Dr. Carl M. Walstrom, Jr., a psychiatrist with the Psychiatric Institute of Cook County, testified on defendant's behalf. He believed that defendant should be granted unsupervised off-grounds passes. This opinion was based upon the Elgin reports, information from the Isaac Ray Center, where defendant underwent outpatient treatment, and the results of defendant's psychological test. Dr. Walstrom stated that the passes were the next logical step in defendant's treatment and that he would benefit from them. He did not believe defendant presented a danger to himself or anyone else.

While maintaining that defendant should be given the passes, Dr. Walstrom still believed defendant needed further hospitalization as some significant depression persisted. Dr. Walstrom also acknowledged he recommended that defendant be discharged from Elgin in 1991. He no longer agrees with that recommendation, but believes that the passes are a necessary part of defendant's treatment. Dr. Walstrom did not believe defendant is either psychotic or suffering from major depression. He also did not consider defendant's altercations at Elgin to be illustrative of violent behavior.

Defendant's psychotherapist and case manager at Elgin, David Davis, testified that defendant has made progress and that he should be given the passes. During his weekly hour-long therapy sessions with defendant, defendant has gained insight into the nature of his condition and has realized the importance of medication in treating his condition. Davis did not believe defendant exhibited any signs of depression. It was Davis' opinion that defendant should be discharged from Elgin.

Davis did acknowledge, however, that if defendant does not receive his medication, he regresses and that his mental well-being is

based upon both his cooperation and his taking of the medication. Davis did not review the most recent psychological evaluation of defendant which stated that defendant presented a danger to himself. His only knowledge of defendant's medical history was provided by defendant and defendant's father. He did send for defendant's records from the University of Illinois Psychiatric Hospital, but he never received them. While admitting that the records would give him a more complete picture of defendant, Davis felt the information provided by defendant was sufficient to adequately treat him. He did not believe defendant was dangerous.

Dr. Ayala Leyser, an Elgin psychologist who has treated defendant in group therapy for approximately one year, testified that defendant's psychosis is in remission. She did not believe defendant was a threat to others nor did she believe he was violent. However, she only had individual contact with him two or three times a week for about 3 to 20 minutes.

Dr. Harbans Gill, defendant's treating psychiatrist at Elgin since he was found not guilty by reason of insanity, has observed him daily and believes that he is in remission from his major depression and that he should be granted the unsupervised off-grounds passes. Dr. Gill diagnosed defendant with major depression, recurrent type, which can be controlled by lithium. She said this drug has stabilized his condition and is responsible for the remission of his depression. If defendant stops taking his medication, he will regress as the medication only stabilizes his condition and is not a cure for depression. Defendant will consequently require medication to control his psychotic and depressive symptoms. In addition to lithium, he takes the anti-depressant, Sinequan. Dr. Gill reviewed the psychological tests performed on defendant and concluded that he did not present a danger to himself or to anyone else.

In June 1991, Mary Catherine Hughes, a psychologist who works for Dr. Gill, completed a psychological examination of defendant for the purpose of determining his readiness for extended privileges and eventual discharge. She found that defendant is beginning to deal with his emotions and is starting to express his feelings. This process is only in the early stages, however, and Hughes believed defendant needs to focus on his problems in greater depth. Six months subsequent to the completion of this report, Gill recommended that defendant be discharged as he had received the maximum benefits of inpatient treatment.

Dr. Jonathan Kelly, a psychiatrist and medical director at the Isaac Ray Center, testified that he has seen defendant about 13 times since December 1991. He agreed that defendant has a bipolar disor-

der that is currently in remission due to the effectiveness of the lithium and Sinequan. Dr. Kelly believed that unsupervised off-grounds passes would benefit defendant and were the next step in his treatment. He did not believe defendant is dangerous or that he is hiding any symptoms.

After hearing and evaluating the testimony of 11 witnesses, the trial court found that the State proved, by clear and convincing evidence, that defendant should not be granted unsupervised off-grounds passes. Defendant appeals.

Initially, defendant posits that the trial court's denial of the Department's request to grant him unsupervised off-grounds passes was against the manifest weight of the evidence.

At a hearing to determine whether a defendant who has been involuntarily committed can be conditionally released, the State must establish by clear and convincing evidence that commitment is proper. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).) An order authorizing involuntary commitment is appropriate when a defendant's prior dangerous conduct and need for continuing inpatient mental health treatment exist. (*In re Williams* (1987), 151 Ill. App. 3d 911, 921.) "Such an order must be based upon an explicit medical opinion regarding the individual's future conduct [citations], as well as a 'fresh evaluation of an individual's conduct and state of mind.' " (*People v. Washington* (1988), 167 Ill. App. 3d 73, 79, quoting *People v. Bradley* (1974), 22 Ill. App. 3d 1076, 1084; see *People v. Winston* (1989), 191 Ill. App. 3d 948.) It is the province of the trier of fact, not the psychiatrists, to weigh all the evidence presented (*People v. Williams* (1986), 140 Ill. App. 3d 216, 226), and its determination will be reversed only if manifestly erroneous. *In re Williams*, 151 Ill. App. 3d at 919.

Extensive testimony was offered concerning defendant's on-going mental illness. Both Drs. Lahmeyer and Ali testified that the doctors at Elgin had incorrectly diagnosed defendant. The Elgin doctors characterized defendant's major clinical problem as "major depression, recurrent and with psychotic features." Dr. Lahmeyer, a forensic psychiatrist, and Dr. Ali, also a forensic psychiatrist and former supervisor at Elgin, both believed that this diagnosis was inadequate. Dr. Lahmeyer performed the most recent psychiatric evaluation of defendant and diagnosed him as "manic depressive, bipolar, with mixed personality disorders." Dr. Ali believed that defendant's family history of manic depression was not adequately explored when his treatment plan was formulated and noted that defendant has experienced episodes characteristic of manic depression which were not addressed by the professionals at Elgin.

Defendant's condition was being treated with lithium, which Dr. Ali noted is used to treat manic depressive illness, not major depression. Dr. Ali also observed that when defendant's lithium level was decreased, his symptoms worsened. This change in his condition supports the diagnosis of a bipolar disorder or manic depressive illness as opposed to major depression. Dr. Lahmeyer, when asked if defendant should be granted the unsupervised off-grounds passes, stated that the passes were "premature." He indicated that defendant was very defensive, unable to deal with his hostility and violent feelings, and had paranoid tendencies. Defendant's history of psychotherapy had not been examined at Elgin and Dr. Lahmeyer believed that it had a direct bearing on his present condition. Additionally, defendant's resort to violence when confronted with the "loss of dependent relationships" was not explored. Defendant still has little insight into his psychological problems including the killings of his wife and child and the events leading up to their deaths. Dr. Lahmeyer still saw some psychotic potential in defendant, believed he was a danger to himself, and consequently found him unprepared for unsupervised off-grounds passes.

Dr. Ali also believed that defendant should not be granted the passes and characterized defendant's treatment at Elgin as "inadequate" partially due to the failure to examine or address the "significant omission" of the underlying reasons leading up to the murders. Elgin's assessment of defendant neither included the exploration of his history of aggression nor did it consider the medical records from his past three hospitalizations and his outpatient treatment. Dr. Ali found this significant. He believed that both defendant's history and treatment must be reviewed in conjunction with the underlying reasons for his actions.

Both Drs. Ali and Lahmeyer found no evidence of the examination of the violence issue with defendant and this issue thus continues to exist. Defendant's violent outbursts at Elgin were not substantively explored and were simply treated with an increase in his lithium level. Both doctors also agreed that past violence correlates with future violence. The Elgin staff, however, failed to see any dangerousness regarding defendant. Dr. Lahmeyer attributes this failure to "the mask of sanity," defendant's ability to appear "normal." According to Dr. Lahmeyer, defendant's ability to convince everyone that he is fine is part of the nature of his problem.

■ The trial court evaluated all of the testimony presented and ruled:

"We had three psychiatrists, two that are presently treating him, that testified that he should be granted the off-grounds pas-

ses. We also had two psychiatrists which the State presented that said he should not be granted the off-grounds passes. We also had a number of social workers that also stated that he should be granted the off-grounds passes.

Weighing the testimony, as I must, and weighing the testimony of the various witnesses, as I must, it is the opinion of this Court because of the serious nature of the offense, the State here has shown at this time by *** clear and convincing evidence that the Petitioner should not be allowed off-grounds passes ***."

We conclude the trial court's finding—that the State had satisfied its burden of proof—was not against the manifest weight of the evidence.

Relatedly, defendant opines that the trial court erroneously relied solely on the serious nature of his offenses in denying the Department's request for unsupervised off-grounds passes as this factor, in itself, cannot sustain a denial of privileges.

■ Before ruling, the trial judge clearly stated that he weighed all the testimony and listened to all 11 witnesses. He stated the State had the burden of proving, by clear and convincing evidence, that defendant should not be granted the passes. He indicated that defendant suffers from depression and "will suffer from depression unless he is taking his medication." The trial judge also recognized that defendant's condition is hereditary. As previously shown, the trial judge did consider the "serious nature of the offense[s]" when ultimately finding that defendant should not be allowed the passes. We find nothing in the record supporting the assertion that the trial judge's ruling was based solely on the nature of defendant's offenses.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL and THEIS, JJ., concur.