THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN CROSS, Defendant-Appellant.

First District (4th Division)   No. 1—96—0801

Opinion filed June 30, 1997.—Rehearing denied July 28, 1997.—Modified opinion filed July 31, 1997, *nunc pro tunc* June 30, 1997.

Edwin F. Mandel Legal Aid Clinic, of Chicago (Mark J. Heyrman and James P. Oppenheimer, law student, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine L. Kornak, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

In 1982, after a jury trial, defendant John Cross, also known as John Binford, was found not guilty by reason of insanity of the murder of two women, the assault and attempted murder of a man, and the assault and attempted murder of another woman in her home. Defendant was charged with two counts of murder, one count of attempted murder, and one count of home invasion. Defendant was remanded to the custody of the Department of Mental Health and Developmental Disabilities (DMHDD) and given a *Thiem*[1] date of natural life. The circuit court subsequently denied supervised off-grounds passes for defendant from the Elgin Mental Health Center (Elgin) where defendant is currently being treated.[2] On appeal, defendant contends that (1) the trial court erred in denying him supervised off-grounds passes because its decision was against the manifest weight of the evidence, and (2) was inconsistent with defendant's continued progress and treatment. For the reasons set forth below, we remand for a new hearing on whether defendant should be granted supervised off-grounds pass privileges.

In 1975, defendant was incarcerated for 4½ years for armed robbery. While in prison, defendant had a vision of his grandmother, who told him "to go down south" and protect her because defendant's aunt was trying to harm her. In 1981, defendant's grandmother died,

---

[1] "The date ending the maximum period of involuntary commitment under [section 5—2—4(b) of the Unified Code of Corrections (730 ILCS 5/5—2—4 (West Supp. 1995))] is commonly known as the *Thiem* date." *People v. Cross*, 274 Ill. App. 3d 159, 161, 653 N.E.2d 1308 (1995). See also *People v. Thiem*, 82 Ill. App. 3d 956, 403 N.E.2d 647 (1980).

[2] Defendant has previously appealed three times to this court. In *People v. Cross*, No. 1—87—0307 (1989) (unpublished order under Supreme Court Rule 23), we affirmed the trial court's denial of defendant's petition for discharge. In *People v. Cross*, 274 Ill. App. 3d 159, 653 N.E.2d 1308 (1995), we affirmed the trial court's determination that a natural life sentence is to be utilized as the maximum period of defendant's involuntary commitment. In *People v. Cross*, 285 Ill. App. 3d 1090 (1996) (unpublished order under Supreme Court Rule 23), we affirmed the order of the trial court denying defendant's petition for unsupervised on-grounds passes and supervised off-grounds passes.

and at the funeral on June 12, 1981, defendant's "vision" reemerged. Defendant believed that his grandmother had been killed by his aunt, and that same day, he ingested cocaine, LSD, and alcohol, and was hearing voices of God telling him to complete his mission. Also on the same day, while driving to Alabama to kill his aunt, defendant realized that he had no money to buy gasoline. Defendant pulled into a car wash and saw a man sitting in his car. Defendant approached the man and asked the man to lend him his car so defendant could do the job of Jesus Christ, stating that he had a mission for God to kill "witches and warlords [warlocks]." Defendant also asked the man to point out two sinners, and the man pointed to two girls. Defendant then shot and killed the two girls and shot and wounded the man.

Defendant then ran past a yard and saw a garage where a boy was waving at him. He followed the boy into the boy's house and picked up a kitchen knife and stabbed the boy's mother. The woman's husband came to help and hit defendant several times with a pipe wrench. When the police arrived, they took defendant to the hospital. Defendant was subsequently charged with two counts of murder, attempted murder, and home invasion. After a jury trial, he was found not guilty by reason of insanity and was committed to the DMHDD for treatment.

On October 26, 1995, the facility director of the Elgin, Illinois, Mental Health Center sent a letter to the circuit court and attached a "treatment report" from the Center's Forensic Treatment Program, seeking court approval pursuant to section "1005—2—4(b) of the Criminal Code" for unsupervised on-grounds and supervised off-grounds pass privileges for defendant. The report was dated September 28, 1995, and detailed some of defendant's treatment history. The report stated that on September 27, 1982, defendant was sent to Elgin and, for the first nine years of his treatment, he expressed anger and depression at his commitment imposed pursuant to the *Thiem* date of natural life because it was an "overly harsh" and "unfair" ruling by the court. On March 20, 1983, defendant "eloped" from Elgin and went to his mother's home. On March 22, after being gone for two days, defendant voluntarily returned to Elgin and was subsequently transferred to a more secure location at the Chester Mental Health Facility. In 1986, and again in 1989, defendant contemplated suicide. Prior to 1991, defendant refused to follow treatment regimes, experienced episodal agitation, exhibited difficulty accepting authority, and exhibited a lack of discretion in social situations.

The report further indicated that defendant began to show signif-

icant changes after May 1990. Defendant responded to psychological treatment by examining factors contributing to his "maladaptive means of coping." He also showed improvement in utilizing "constructive means of diverting his anger into a more constructive form of energy," became more invested in programming aspects of treatment, became cooperative and pleasant, was taking his medication willingly, attended and graduated from many treatment groups, maintained his sobriety from alcohol and drugs, and participated in vocational training in janitorial services.

According to the report, however, in 1994 and 1995 defendant experienced some difficulties. In 1994, defendant had been transferred to the William White Unit, a co-ed residential unit, and became emotionally and sexually involved with a female patient. The female patient became pregnant and eventually gave birth to twins. Defendant and the female patient were both transferred back to their respective home units due to a violation of hospital policy, and defendant's mother currently has custody of his children. In January 1995, defendant struck another patient. Defendant had been continuously provoked by this patient and struck him and cut his lip. Defendant later apologized for the incident. Additionally, in May 1995, defendant was agitated and challenging toward a male staff member and subsequently expressed regrets about this incident to his therapist.

The report, written by Sylvia S. Sun, M.S., staff psychologist, and Fe Velasco, M.D., clinical psychiatrist, recommended passes for defendant and concluded that defendant was "NOT considered dangerous to his or other's safety" and "[was] not considered a risk for elopement of [sic] violence." The report recommended the supervised off-grounds passes for the following purposes:

> "The Supervised Off-Grounds Passes will initially be used for the purpose of interviews and evaluations of Mr. Cross at the Isaac Ray Center. Subsequently to this, the Supervised Off-Grounds Pass privileges will be used to attend leisure awareness groups utilizing community resources, to visit placement facilities and/or outpatient mental health centers under the supervision of a staff member. In order to link Mr. Cross to Isaac Ray Center, Supervised Off-Grounds passes are requested."

The DMHDD facility director also recommended the unsupervised on-grounds and supervised off-grounds pass privileges for defendant in his October 26, 1995, letter.

On January 25, 1996, at a hearing on whether defendant should be granted pass privileges, the State and defendant's attorneys disagreed as to which party bore the burden of proving by clear and

convincing evidence that defendant should or should not be granted pass privileges. Defendant argued that the State was required to show by clear and convincing evidence that defendant should not be granted pass privileges. Defendant also argued that treatment at the Isaac Ray facility was "absolutely necessary in evaluating *** [his] progress for rehabilitation and reintegration into the community and in using these passes *** [he] would be accompanied by a staff member of the Elgin Mental Health Center at all times."

In response, the State argued:

"[MR. BILYK, Assistant State's Attorney]: Briefly, first of all, the statute, Section 730 Illinois Compiled Statutes, 5/5—2.4 [*sic*], states that the finding of the Court shall be established by clear and convincing evidence, the burden of proof or the burden of going forth with the evidence rests with the State when a hearing is held to review the determination of the facility director that the defendant should be transferred to a nonsecure setting, discharged or conditionally released.

The burden of proof and the burden of going forward with the evidence rests on the defendant when a hearing is held to review a petition filed by or on behalf of such defendant.
* * *

And I believe there is some question as to who actually has the burden of proof and the burden of going forward as it is the recommendation of the facility, but a determination as to transfer to a nonsecure setting is not really the request here ***.
* * *

*** I think it's a request by the defendant with a recommendation from the doctors at the facility, a petition by the defendant. These are the defendant's attorneys, not the department of mental health attorneys. And we are not reviewing a determination by the facility director, we are actually having a hearing that can— what it is, Judge, whoever has the burden of proof.

I am arguing certainly that the defendant has the burden of going forward and the burden of proof and that being as it may, whoever has the burden of proof I believe the evidence will show that the defendant is and still remains to be a risk and needs to be further in the department of mental health without incident before unsupervised on grounds passes or supervised off grounds passes should be allowed."

The court subsequently stated:

"You may proceed, Mr. State's Attorney. The Court is taking the position it is your burden since this is—you are taking a position contrary to the recommendation of the Illinois Department of Mental Health."

The State then called Dr. Fe Velasco as a witness. Velasco stated that she was employed as a forensic psychiatrist at the Elgin Mental Health Center and that defendant had been her patient since August 1995. She also stated that she saw defendant two to three times a month regarding formal evaluations for medication, once a month for formal team meetings and to determine his progress, and as needed if something arose.

Dr. Velasco further testified that defendant had been diagnosed as a paranoid schizophrenic after his acquittal by reason of insanity. She was aware of the circumstances causing his arrest and trial. She was also aware that defendant had previously been incarcerated for armed robbery and, while incarcerated, choked another inmate. She further knew that defendant had previously abused drugs, including marijuana, LSD, cocaine, Valium, and alcohol, but noted that he had not tested positive for drugs since he was admitted to Elgin in 1982. Velasco also testified about some problems defendant initially experienced after his commitment to Elgin. At the beginning of his term, defendant maintained delusions that he was a witch and a warlock and that people were out to get him. Defendant also thought all women were hookers and should be eliminated. Defendant stated that he thought his girlfriend was stealing his sperm and giving it to her sisters in an attempt to impregnate them.

Dr. Velasco further stated that in 1983 defendant escaped from Elgin; however, she contradicted her written report, which had indicated defendant was missing for two days, and stated that he had only been gone for half a day. When asked about the discrepancy, Velasco stated that after discussing the incident with Sylvia Sun, defendant's case manager, they decided defendant had only been missing for half a day. Velasco also stated that, after defendant returned from his escape, he was considered a risk and was transferred to a more secure facility at Chester, where he stayed until 1987. After defendant returned to Elgin in 1987, he was involved in a fight with other patients and was transferred to another unit. Sometime later, defendant was involved in another altercation during which he broke a chair leg, threw it at another person and broke some windows with the chair leg.[3] At the time of this incident, defendant was not properly medicated because he had been "cheating" by not taking his dosage. Because of the incident with the chair leg, defendant was again transferred to Chester.

Dr. Velasco also stated that from 1990, when defendant was

---

[3]The record does not indicate an exact date, although it was sometime between 1987 and 1990.

transferred back to Elgin, to 1993, he had been treated by Dr. Block. According to Velasco, in 1992 defendant was still delusional and still believed in witches and warlocks. Velasco also noted that Block's notes indicated that defendant believed witches and warlocks were real, and this belief was his religion. Block's notes also indicated that defendant was the most dangerous person in Block's unit at that time.

Dr. Velasco further stated that in September 1993 defendant was granted a transfer to the William White Unit, a less secure facility outside the fence at Elgin. While at William White, defendant impregnated a female patient and was transferred to the Pinell Unit in April 1994. Defendant received visits from his twin daughters, who were born as a result of his relationship with the female patient, and he was motivated and trying to educate himself about parenting so that he could take care of his children whenever he is released. Velasco also stated that, while at Pinell on April 28, 1994, defendant became angry at a staff member and told the staff member that he "was going to get in his face before he got transferred out of that unit." Defendant continued to have disagreements with the staff over the unit rules during the month of May. When asked whether she was aware of an incident during which defendant struck another patient in the mouth, Velasco testified that she was aware of an incident but could not recall the details of what had happened. As late as 1994, defendant was suffering from depression. He had been treated for his depression with anti-depression medication, but was not currently taking the medication because he did not show any signs indicating he would need it. After defendant had been taken off his anti-psychotic medication because of adverse side effects, he began to exhibit psychotic behavior and the medication treatment was resumed. Velasco could not remember when this occurred.

When asked what the supervised off-grounds passes would be used for, Dr. Velasco stated that defendant would receive further treatment at the Isaac Ray Center, "where they do a more comprehensive and intensive evaluation which Elgin Mental Health Center could not provide." Defendant would be accompanied by a security officer and a driver from the hospital. When asked what programs Isaac Ray would provide defendant, Velasco replied, "To tell you frankly at the present time I really don't know, but based on the knowledge that I know is whatever will benefit John."

On cross-examination, Dr. Velasco stated that she based her evaluation of defendant's progress on her personal observations and consultation with the unit director, the activity therapist, other social workers, defendant's case manager Sylvia Sun, a mental health

technician, unit directors, and a nursing supervisor. She further stated that she met twice a week with the staff in formal staff meetings to discuss defendant's treatment. Based on her evaluations and defendant's continued treatment with shots of Haldol once every 28 days, Velasco stated that defendant's psychosis was in remission.

Dr. Velasco also testified on cross-examination that defendant understood the importance of taking his medication and requested that he be maintained at the current level of medication. Velasco noted that, from 1987 to 1989, defendant's medication was reduced, contributing to his relapse into aberrant behavior. She further stated that defendant had been compliant with all aspects of his treatment in the past year, and his insight into his illness had increased significantly; he currently expressed remorse for his crimes and for his victims; and he had also been drug free, and presented himself as an "articulate, alert, well-oriented and well-groomed man." Velasco also stated that defendant's mood was stable, he had learned how to respond to setbacks and disappointments, improved his educational level, and was placed with a roommate who was exhibiting severe behavioral problems because defendant was able to deal with this type of behavior. In the past year, defendant had not had any homicidal thoughts, had not required any physical restraint and had not for the past seven years, did not pose a risk of elopement, and complied with his medication. According to Velasco, the pregnancy that occurred as a result of defendant's relationship with a female patient was not an infraction of official hospital policy.

On redirect examination, the State elicited from Velasco that she had only been assigned to defendant's case for one month when she wrote the recommendation for the unsupervised on-grounds and supervised off-grounds passes. The State also questioned Velasco about hospital policy regarding sexual relations between patients:

"Q. [MR. BILYK, Assistant State's Attorney:] Was it an infraction of any rule?

A. It was not an infraction of [a] rule as far as [the] hospital is concerned because we have discovered that the hospital don't [sic] have written policy with regards to another recipient getting pregnant another recipient.

Q. So is it encouraged by the hospital?

MR. HEYRMAN: Objection.

THE COURT: Overruled.

THE WITNESS: It is not encouraged by the hospital. To me I feel, you know, the sexual interaction is one of the basic human rights. You cannot deprive these patients of any of these rights. It's part of their instinct, their drives, it's a basic drive, really.

And I should say it's a human right which we can never take away from these patients.

MR. BILYK: Q. So do you think that Mr. Cross should be cohabitating in the William White Unit again?

A. Not at this time to my knowledge. We are not requesting for that. We are only requesting for privileges.

Q. I understand that, but do you think he should be?

A. It's hard to say at this point.

Q. Do you think that he should be separated from females?

A. I really don't know how to answer that."

The trial court then asked Dr. Velasco whether defendant still believed in witches and warlocks. Velasco replied that he did not. The State then rested, and defendant moved for a finding in his favor, arguing that the State failed to prove by clear and convincing evidence that he should be denied pass privileges. The trial court denied defendant's motion.

Thereafter, defendant called Dr. Sylvia Sun, a staff psychologist at Elgin, as a witness. She testified that she first met defendant in May 1987 and, at that time, he was psychotic and delusional, and his medication dosage was very low. Sun stated that as of July 1995, she became defendant's case manager and created his overall treatment plan. Sun also participated in weekly therapy meetings with defendant and had not noted any delusions about witches and warlocks by defendant. Sun discussed defendant's program and stated that defendant was "owning up to his mental illness *** acknowledging he is suffering from schizophrenia paranoid, and without medication he could be very dangerous." Sun further stated that defendant's social skills had improved over the last 10 years, and defendant was friendly, sociable and did not speak in an angry tone anymore. Defendant also had recognized the magnitude of his crimes and the extent to which his illness played a part in those crimes. Sun further stated that, in the past few years, defendant had not had any suicidal or homicidal expressions and that, as long as defendant remained medicated at his current dosage, he would remain nonpsychotic. When asked how the birth of defendant's two children had affected him, Sun replied:

"I think they gave him an additional sense of wanting to work harder and wanting to be a better person and motivate him.

As a matter of fact, just two days ago he was telling me, he said, Sylvia, you have to teach me what the steps—what I need to do, you know, that to so eventually—we are not talking about now, eventually down the road, he will be able to get a job and, you know, support his family and raise his two kids. Okay."

Dr. Sun also described the DMHDD's criteria for determining a

recommendation for on-grounds and off-grounds pass privileges. First, the patient must cooperate with medication and must attend all the treatment plans and programs on a consistent basis. The patient must also demonstrate no aggression or aggressive behavior within a six-month to one-year time frame. The patient must also follow all the mental health facility's rules. Once this has been established, the case manager reviews the patient's file and makes a proposal. The treatment team then reviews the findings. Once the team approves the recommendation, a report is issued and sent on to an independent psychiatric doctor for another opinion. After the independent psychiatrist approves the findings, the forensic program director reviews the recommendation and passes it to the facility director and superintendent. Finally, the recommendation goes to Springfield, Illinois, for final approval. In defendant's case, the recommendation was approved at every level of review.

Dr. Sun then discussed the supervised off-grounds passes the program recommended for defendant. She stated that the Isaac Ray Center (the Center) would go over defendant's entire case and do a complete and independent case study. The Center would then give defendant a complete testing of psychological and neuropsychological responses. She also stated that the Center provides a more comprehensive and specialized form of treatment for patients. She further stated that if the Center did not believe that defendant was ready for such a specialized, group therapy form of treatment, it would reject him from the program, and defendant would be sent back to Elgin without the option of participating at the Center. If defendant successfully completed the approximately six-month program at the Isaac Ray Center, he would then graduate to a program attempting to integrate him into society, gradually exposing him to the community. Sun stated that the process would be very slow and cautious, and defendant would always be accompanied by at least one staff member.

On cross-examination, Dr. Sun stated that defendant's outburst with the chair leg in 1991 was due to a psychotic state and that defendant, as recently as November 1995, exhibited difficulty in accepting authority. Sun further stated that if defendant was accepted into the Isaac Ray Center and successfully completed the six-month program, he could be travelling to the Center with a group of patients, without supervision after that time period.

After closing arguments, the trial court granted unsupervised on-grounds passes for defendant, but denied the supervised off-grounds passes, stating:

"The court is specifically denying all supervised off grounds passes

to allow defendant to go to the Isaac Ray facility as indicated here. The court believes that the State has shown by that [*sic*] clear and convincing evidence that the defendant still in his present state remains a risk to his own safety and the safety of others and that it is not necessary at this point for the continued process.

\* \* \*

Clearly the defendant Mr. John Cross who was the defendant in the original case, may some day in the near future, maybe not in the near future, may be ready for further privileges. The court believes that this case and has considered the prior acts as well as that is the crime that was allegedly committed as well as the present evaluation, he may in fact be some day ready for these continued extended privileges.

The court does not believe that it is a reasonable request at this time. The people have testified to this court that this must be a slow process and the court believes that this is a logical step, the first step and I will not approve the further step."

This appeal followed.

Defendant first contends, relying on section 5—2—4 of the Unified Code of Corrections (Code) (730 ILCS 5/5—2—4 (West 1996)), that the trial court's decision denying the facility director's (director's) recommendation that he be given off-grounds pass privileges was against the manifest weight of the evidence. Defendant argues that the State failed to prove by clear and convincing evidence that the director's recommendation should be denied. The State argues that the trial court's denial of the director's recommendation to allow defendant supervised off-grounds passes was supported by clear and convincing evidence indicating that defendant remained a risk to his safety and to the safety of others.

Before proceeding to defendant's argument, we first address the issue of the burden of proof and going forth with the evidence in this matter (burden of proof). Defendant argues that the same burden of proof applicable when a director petitions for a defendant's transfer to a nonsecure setting, discharge, or conditional release, which rests with the State, also applies when a director petitions for supervised or unsupervised pass privileges in behalf of a defendant. The State does not argue otherwise, contrary to its argument in the trial court that the burden of proof rested with defendant. We find, however, that defendant's and the State's apparent interpretation of the statute is contrary to the plain meaning of the statute.

■ "When interpreting a statute, the primary objective is to give effect to the legislature's intent [citation], which is determined primarily from the legislative language itself." *People v. Shelton*, 281 Ill. App. 3d 1027, 1033 (1996). "If the legislative intent can be ascertained

from the statute's language, it must prevail and will be given effect without resorting to other aids for construction." *Shelton*, 281 Ill. App. 3d at 1033.

■ Section 5—2—4(g) of the Code (730 ILCS 5/5—2—4(g) (West 1996)) provides the standard of review and the burden of proof as follows:

> "The findings of the court shall be established by clear and convincing evidence. The burden of proof and the burden of going forth with the evidence rest with the State when a hearing is held to review the determination of the facility director that the *defendant should be transferred to a non-secure setting, discharged or conditionally released.* The burden of proof and the burden of going forth with the evidence rest on the defendant when a hearing is held to review a petition filed by or on behalf of such defendant. The evidence shall be presented in open court with the right of confrontation and cross-examination." (Emphasis added.)

Thus, there are only three specific instances, after a defendant has been committed, when the burden of proof rests with the State: when a facility director determines that a defendant should be transferred to a nonsecure setting, discharged or conditionally released.

■ Subsections (d) and (e) both specifically provide for the filing of petitions in these three instances by the facility director (subsection (d)) and by the defendant or someone in his behalf (subsection (e)). In the present case, however, the director recommended pass privileges in behalf of defendant to modify his treatment plan. Accordingly, subsection (b) of section 5—2—4 applies because the recommendation of pass privileges constitutes a modification of defendant's "treatment plan," and not a "transfer to a non-secure setting, discharge, or conditional release." See *People v. Owens*, 269 Ill. App. 3d 152, 645 N.E.2d 483 (1994). More specifically, section 5—2—4(b) provides, in pertinent part:

> "During this period of time [when the defendant has been involuntarily committed], the defendant shall not be permitted to be in the community in any manner, including but not limited to *off-grounds privileges*, with or without escort by personnel of the Department of Mental Health and Developmental Disabilities, *unsupervised on-grounds privileges, discharge* or *conditional or temporary release*, except by a plan as provided in this Section. *** Not more than 30 days after admission and every 60 days thereafter so long as the initial order remains in effect, the facility director shall file a *treatment plan* with the court. Such plan shall include an evaluation of the defendant's progress and the extent to which he is benefiting from treatment. Such *plan may also include unsupervised on-grounds privileges, off-grounds privileges*

(with or without escort by personnel of the Department of Mental Health and Developmental Disabilities), home visits and participation in work programs, but only where *such privileges* have been approved by specific court order, which order may include such conditions on the defendant as the Court may deem appropriate and necessary to reasonably assure the defendant's satisfactory progress in treatment and the safety of the defendant and others." (Emphasis added.) 730 ILCS 5/5—2—4(b) (West 1996).

Based on the foregoing language, which lists "privileges," "discharge" and "conditional release" as separate terms, it is clear that requests for *privileges*, such as on- and off-grounds passes, are distinct from requests for a defendant's conditional release or discharge, which do not result in the Department's or the court's relinquishment of its custody over defendant as would discharge or conditional release pursuant to subsection (D) of section 5—2—4 (730 ILCS 5/5—2—4(a)(1)(D)). Similarly, requests for privileges are distinct from requests to transfer a defendant to a nonsecure setting as provided for in subsections (d) and (e). Section 5—2—4(a) provides that a defendant shall be placed in a secure setting (a designated secure facility) and, accordingly, we interpret a defendant's transfer to a nonsecure setting to mean a transfer to a nonsecure facility to reside there, as opposed to a "visit" to a nonsecure facility for out-patient testing and treatment, as here, pursuant to defendant's requested off-grounds pass privileges. We additionally observe the distinction between pass privileges and a transfer to a nonsecure setting, discharge or conditional release based on the fact that a petition seeking the latter three require a hearing, whereas a defendant is not entitled to a hearing regarding a modification of his treatment plan to include pass privileges; pursuant to subsection (b), a trial court is only required to review the treatment plan, and the decision of whether to hold a hearing is within the trial court's discretion. *People v. Chiakusas*, 288 Ill. App. 3d 248, 253 (1997); *Owens*, 269 Ill. App. 3d at 157. We believe this is so because no due process liberty interest is involved when a defendant seeks pass privileges; the defendant is not challenging his commitment to the state facility but, rather, seeks privileges subject to the court's approval, to modify his treatment plan during his commitment status.

Because neither subsection (b) nor subsection (g) provides for the burden of proof when a facility director recommends a change in a defendant's treatment plan, we therefore conclude, based on the specificity of subsection (g) setting forth the three instances when the burden of proof rests with the State, as well as the fact that because the legislature could have but did not provide for the burden of proof

in subsection (g) when a defendant or someone in his behalf petitions for a change in his treatment plan, that the legislature did not intend that the burden be on the State when a modification of a defendant's treatment plan is sought.

We also briefly note that defendant's reliance on the Report, Governor's Commission for Revision of the Mental Health Code of Illinois (*Report*, at 51 (1997)), in support of his burden of proof argument, is misplaced. The report's comments in subsection (g), that the burden of proof rests with the State when a director files a petition as opposed to when a defendant or someone in his behalf files a petition, clearly pertained to those instances when the relief sought was a defendant's release or discharge, as opposed to pass privileges as in the case at bar.

■ We also disagree with the trial court's rationale that since the State was opposing the pass privileges, the burden of proof rested with the State. In proceedings initiated by a defendant or someone in his behalf pursuant to subsection (e), a defendant has the burden of proof pursuant to subsection (g) if the petition is for transfer to a nonsecure setting, discharge or conditional release. Accordingly, even if the State opposed a defendant's petition in either of these three instances, the defendant, not the State, would have the burden of proof. We therefore do not find any reason why the filing of a petition for pass privileges by a defendant or someone in his behalf, here the facility director, should be treated differently with respect to the burden of proof.

Accordingly, pursuant to subsection (b) of section 5—2—4, the burden of proof rested with defendant because the "petition" for pass privileges was filed by the facility director in behalf of defendant for a modification of his treatment plan, as opposed to the director's filing of a petition seeking defendant's transfer to a nonsecure setting, discharge or conditional release.

We further briefly note that the case law relied on by defendant in support of his argument that the burden of proof rested with the State is inapplicable to the case at bar. In the majority of those cases, the reviewing courts were either addressing the issue of a defendant's initial commitment to a DMHDD facility or discharge or conditional release, as opposed to a request for pass privileges as in the present case.[4]

Defendant's reliance on three other cases, in which petitions for

---

[4]See *Shelton*, 281 Ill. App. 3d 1027 (petition for discharge or conditional release); *People v. Nelson*, 244 Ill. App. 3d 356 (1993) (petition for conditional release); *People v. Hager*, 253 Ill. App. 3d 37 (1993) (involuntary commitment

pass privileges were filed, is also misplaced. In *People v. Reed*, 126 Ill. App. 3d 1020, 467 N.E.2d 1158 (1984), the DMHDD facility director petitioned for "nonsecure" off-grounds pass privileges for the defendant as part of his treatment plan pursuant to subsection (b) of section 5—2—4 of the Code (730 ILCS 5/5—2—4(b) (West 1996)). At the time of the hearing, the Unified Code of Corrections did not provide guidance as to the burden of proof and going forth with the evidence. The trial court assigned the burden of proof and going forth with the evidence to the DMHDD and subsequently denied the facility director's request. In reversing the trial court, the *Reed* court held that "[w]hen a hearing is initiated by the Department facility director (in contrast to one initiated by a defendant or on his behalf) for transfer to a nonsecure setting, discharge or conditional release, the burdens of proof and going forth with the evidence rest with the State." *Reed*, 126 Ill. App. 3d at 1023. We disagree with the *Reed* court's holding, however, based on the fact that the DMHDD facility director in *Reed* was not petitioning for the defendant's "transfer to a nonsecure setting, discharge, or conditional release" but, rather, for unsupervised off-grounds pass privileges, which here we have distinguished as being different.

Defendant's reliance on *People v. Robin*, 264 Ill. App. 3d 936, 638 N.E.2d 666 (1994), is also misplaced. In *Robin*, where the DMHDD facility director petitioned for unsupervised off-grounds pass privileges, no issue on the burden of proof was raised by the parties. We further observe that the *Robin* court relied on subsection (g) of section 5—2—4 and treated the defendant's request for pass privileges as a "conditional release," which, as we have discussed above, is different from a request for pass privileges.

Lastly, contrary to defendant's argument, the decision in *Owens* supports this court's analysis of section 5—2—4. In *Owens*, the court discussed whether a defendant who petitioned for pass privileges was entitled to a hearing under section 5—2—4. The *Owens* court specifically distinguished petitions for pass privileges from petitions for transfer to a nonsecure setting, discharge, or conditional release when it held that the defendant was not statutorily entitled to a hearing because subsection (b) does not specifically grant the right to

proceeding); *People v. Washington*, 167 Ill. App. 3d 73, 520 N.E.2d 1160 (1988) (involuntary commitment proceeding); *People v. Hoffmann*, 140 Ill. App. 3d 1056, 489 N.E.2d 460 (1986) (petition for discharge or conditional release); *People v. Williams*, 140 Ill. App. 3d 216, 488 N.E.2d 649 (1986) (involuntary commitment proceeding); *In re Commitment of Risner*, 110 Ill. App. 3d 368, 442 N.E.2d 541 (1982) (petition for conditional discharge); and *People v. Gann*, 94 Ill. App. 3d 1100 (1981) (petition for conditional discharge).

a hearing, and the subsections that do provide that a hearing is required do not include instances where a defendant is petitioning for pass privileges. This distinction is supported by the plain meaning of the statute, as discussed above.

In summary, we hold that when a court conducts a hearing to determine whether a defendant, as part of a change in his treatment plan should be allowed pass privileges, the burden of proof is on the defendant where he or someone in his behalf (here the facility director who recommended the pass privileges) proposes the modification. Also, while the trial court should grant deference to the DMHDD's expertise in recommending pass privileges, nonetheless, subsection (g) of section 5—2—4, which provides the only standard of review applicable to this section, requires that "the findings of the court shall be established by clear and convincing evidence." 730 ILCS 5/5—2—4(g) (West 1996). Additionally, pursuant to subsection (b), the trial court must also base its decision to grant pass privileges on what is "appropriate and necessary to reasonably assure the defendant's satisfactory progress in treatment and the safety of the defendant and others." 730 ILCS 5/5—2—4(b) (West 1996).

Based on the foregoing, because defendant was not aware that he had the burden of proof, and might have put forth different evidence or trial strategy had he been so apprised, we remand this case to the trial court for a new hearing on whether defendant should be granted supervised off-grounds pass privileges.

For the reasons stated, we remand this case to the circuit court of Cook County for further proceedings. In light of our holding, we do not need to address defendant's arguments that the trial court erred in denying him supervised off-grounds pass privileges and that that denial was inconsistent with his continued progress and treatment.

Remanded.

HARTMAN and DiVITO, JJ., concur.