THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND WOLST, Defendant-Appellant.

First District (1st Division)    No. 1—02—2878

Opinion filed March 29, 2004.

Edwin F. Mandel Legal Aid Clinic, of Chicago (Mark J. Heyrman, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and James D. Ridgway, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

Defendant, Raymond Wolst, suffers from paranoid schizophrenia. In 1996, defendant shot and killed a stranger in a health club while under the delusional belief that the victim was a federal agent. While initially found unfit for trial, defendant was subsequently found fit and not guilty by reason of insanity in November 1997. Defendant was thereafter confined to Elgin Mental Health Center. On January 23, 2002, the facility director at Elgin recommended that defendant be

transferred to a nonsecure setting and that he be granted supervised off-grounds and unsupervised on-grounds pass privileges. On February 28, 2002, defendant petitioned the trial court for a transfer to a nonsecure setting; supervised off-grounds pass privileges; and unsupervised on-grounds pass privileges under section 5—2—4(e) of the Unified Code of Corrections (Corrections Code or Code) (730 ILCS 5/5—2—4(e) (West 2000)). On August 15, 2002, the trial court granted the unsupervised on-grounds pass privilege, but denied defendant's request to be transferred to a nonsecure setting and request for supervised off-grounds pass privileges. Defendant appeals the trial court's denial of these two privileges.

We address the following issues: (1) whether the trial court's decision to deny the two requested privileges was against the manifest weight of the evidence; (2) whether the trial court's application of the current version of section 5—2—4(g) of the Corrections Code was an improper retroactive application of the law in violation of section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2000)); (3) whether the application of the current version of section 5—2—4(g) violates the *ex post facto* clause of the United States Constitution; (4) whether section 5—2—4(g), as amended, violates defendant's substantive due process rights under the United States Constitution by shifting the burden of proof to defendant; and (5) whether section 5—2—4(g), as amended, violates procedural due process by failing to ensure adequate safeguards for the protection of defendant's liberty interest. We state the following background facts.

At a hearing on July 17, 2002, defendant presented the testimony of four witnesses to support the relief requested.

Judy Long, a social worker at Elgin, said she had known the defendant since 1997 and that he was the most "appropriate" patient in the unit. She stated defendant did not fight or argue with anyone, nor did he threaten or harm anyone. Long said that defendant had changed while admitted at Elgin, that he had a "good range of emotions," and that he was no longer suffering from delusions.

Long explained that defendant had requested a transfer to William White Cottage (WWC), which is a nonsecure unit approximately half a block from the Elgin facility. While the windows and doors at WWC were locked all the time, she stated that there was no security fence around the building. She explained that if a patient wanted to leave WWC, the patient would need an authorized pass and a legitimate destination. A staff person at the doorway checks the patients in and out. To her knowledge, no one had ever escaped from WWC.

Long described an unsupervised on-ground pass privilege as allow-

ing the bearer to travel about a half a block between the housing building and the program building for treatment purposes. In conjunction with the pass, the patient's psychiatric ability is evaluated on a daily basis. If the patient is determined to be unstable, then the privilege is revoked.

Long then characterized defendant's third request, the off-grounds supervised privilege pass, as allowing the patient to occasionally "go off the unit" with staff supervision for the purpose of reintegration into society. An example of this privilege might be "[going] to a driver's license facility and [getting] a state ID, or *** [learning] about resources in the community." For the off-ground trips, there is one staff member for every three patients. In the event a patient attempted to escape while on a trip, staff are trained in the use of restraints and handcuff procedures.

Dr. Roni Seltzberg, a medical doctor and staff psychiatrist for the circuit court of Cook County forensic medical services, testified that she evaluated defendant on June 6, 2002, pursuant to a court order. In her opinion, defendant's mental status had changed significantly since the crime. She determined that defendant was no longer having delusions. She diagnosed defendant as suffering from schizophrenia, paranoid type, which is currently in remission with medication. Seltzberg said that the medication is the major reason defendant had improved. Defendant currently receives two milligrams of Risperidone daily. Risperidone is an antipsychotic agent.

Seltzberg stated that defendant does not present a danger to himself or to others provided he continues with his medication. She pointed out that defendant has not threatened anyone or injured himself since he has been in remission. Seltzberg opined that defendant's transfer to WWC would not pose a danger to defendant or others and would continue to benefit defendant. She did not think the transfer created a risk that defendant would escape or that other patients in the WWC unit would be at risk, as long as defendant continued to take his medication. Seltzberg also said that the transfer would not jeopardize the likelihood that defendant would continue to take his medicine because he would still be in the structured, supervised, and hospital-like setting of WWC.

With regard to the unsupervised on-ground passes, Seltzberg opined that granting this privilege would not pose a risk because defendant did not represent any threat to others or any indication of an intent to escape. With regard to the supervised off-ground pass, she found no evidence that defendant posed a risk of harm to himself or to others, provided he continued taking his medication. The doctor said that her opinion would absolutely change if defendant stopped taking

his medication because her opinion was based upon defendant's continued compliance with taking prescribed medications. Seltzberg stated that the only thing that keeps defendant's symptoms from returning is the drug defendant takes and that defendant will likely need to take the drug forever. She also indicated that stress affected defendant's disease.

Seltzberg described WWC as

"a non-secure building in that it is outside the forensic fence that surrounds the main forensic building, but it is still secure in the sense that it is a locked unit, and the people that are residents are monitored, are provided medications, supervision, and treatment as if they were in any other secured hospital where the doors are locked. They can't just walk in and out at will."

Counsel for the State then asked Seltzberg:

"Q. But the only new stressers [sic] would be [defendant's responsibility for] requesting his medicine at the appropriate time and being left alone?

A. I don't know that I would refer to it as being a stresser [sic] necessarily in this case.

Q. You wouldn't consider that a difference in his environment that wouldn't be considered a stress factor?

A. That may or may not [be] to certain individuals. I don't believe that would be a problem for Mr. Wolst."

Finally, Seltzberg said that defendant's failure to take medication would increase the likelihood that defendant could potentially injure someone or himself.

Dr. Albert Stipes, a staff psychiatrist and assistant director for forensic clinical services at the Cook County circuit court, testified that he examined defendant on April 13, 2002. He said that defendant's condition had changed since the time of the offense and he diagnosed defendant as having schizophrenia, paranoid type, in remission with medication. Stipes stated that defendant's medication is the most important reason for defendant's improvement. He reiterated that defendant receives two milligrams of Risperidone daily which prevents delusions, hallucinations, and thought disorder associated with schizophrenia.

Dr. Stipes testified that defendant's transfer would be safe for the defendant and others because the treatment, medication, and security measures would ensure everyone's safety. He stated that WWC is a locked unit and that patients can only leave if permitted by staff. He said that he did not believe that defendant posed a risk of harm to others or risk of escape from WWC. In his view, defendant's request for an unsupervised on-grounds pass should have been granted based on the improvement in defendant's clinical condition and the security

measures in force for patients with passes. Stipes further endorsed the granting of an supervised off-grounds pass because defendant would be accompanied by staff ensuring the safety of others. According to Stipes, it was necessary for defendant to continue taking his medication, but none of the three requests made by defendant would interfere with him taking it. The doctor said that, if defendant stopped taking his medication, he would not be in favor of granting the passes or the transfer. Stipes admitted that, theoretically, defendant could walk off the grounds with an unsupervised on-grounds pass. However, he said that staff would likely see defendant because they would be looking out the window to watch him.

Dr. Hargurmukh Singh, a psychiatrist employed by the forensic program at Elgin Mental Health Center, testified that he knew defendant and provided treatment to him almost every workday. He diagnosed defendant as schizophrenic, paranoid type. Singh explained that defendant had changed since the crime and that he no longer had symptoms of schizophrenia and that he was considered one of the most stable patients in the unit. The doctor confirmed that defendant took two milligrams of Risperidone daily and he supported defendant receiving the relief requested. He said that no one from WWC had ever escaped because he or she was in possession of a supervised off-grounds pass. The doctor stated that 25% of the patients who get the symptoms of paranoid schizophrenia relapse when they do not take their medication.

During Singh's testimony the trial judge asked the witness:

"THE COURT: Now, if I want to grant [defendant] to be transferred to the [WWC] building, and I was to grant him unsupervised on-ground passes, where would he be allowed to go?

THE WITNESS: Mainly he will be allowed to come back to the main forensic building to the programs which are available, and then when his treatment team sees him suitable he will be allowed to go to building 110, which is rehab, because they have a separate workshop ***.

\* \* \*

THE COURT: Is there a gate before you get to Route 131?

THE WITNESS: Yes there is a traffic light, 131, and there is Elgin ***, no security door.

THE COURT: No security, no guard?

THE WITNESS: No.

THE COURT: So, *** he could just walk out, correct?

THE WITNESS: Theoretically, yes.

\* \* \*

THE COURT: Why is the proposal or recommendation, why is it [not] one step at a time, rather than all three at once?

THE WITNESS: Because doing one—this is just using the street language, if you put him in White Cottage, don't give him ground pass—

THE COURT: Let's make White Cottage the third step rather than the first step, let's look at it. Why would he go in a procedure where first we would have on-ground passes unsupervised, the second step would be supervised off-ground passes, and the third step would be William White. Why wouldn't we proceed in that fashion? Why do we want to do all at once?

THE WITNESS: We have seen that this way it is more effective, because White Cottage [has] certain things available [that] we don't have. For example, they have what we call medication compliance program, which means there is more emphasis on self-reliance, patients have to take their own risks, they have to hear the nurses remind them, well, this is medication time, people come and get their medication.

Everyone is expected to be there on time, they write it down, who came on time, who didn't, and you keep score.

So, there are several little things where the emphasis that the patient take more responsibility on their own.

So, having that environment, giving more privileges, responsibilities, privileges, they both go hand in hand so he get[s] optimum benefits by that arrangement.

It would take away one part, he doesn't get maximum benefits. That is the way we as treatment team see it.

THE COURT: And you don't see that by doing it in that fashion there is not a possibility, not exactly a scientific word, but overload, which would increase the relapse possibility?

THE WITNESS: In my experience in the last several years, actually from the patients who were transferred from my case load to White Cottage, they do extremely well."

At the hearing on August 15, 2002, the court stated:

"Okay. There [have] been *** requests of the Court. The first is for unsupervised ground passes, the second is for a transfer to a less-secure facility on the Elgin grounds; the William White Unit, and lastly, a request for supervised off-ground passes. Among the goals of the mental health center on behalf of Mr. Wolst are to remain in remission of psychosis and to develop an appropriate relapse prevention plan and aftercare plan. The court and the Elgin Mental Health Center are concerned about the safety of Mr. Wolst and society. A relapse by Mr. Wolst could present a danger to Mr. Wolst or others. The need for medication is apparent by the progress that Mr. Wolst has made. The doctors have expressed that Mr. Wolst has made great progress with medication and that the medication is an [integral] part of his treatment as well as to ensure

his safety and the safety of others. The request for a transfer to a more non-secure facility in the William White Unit is premature. There needs to be a time—a period of time of unsupervised ground passes to ensure that Mr. Wolst will remain at Elgin while his medication is being fully monitored. The testimony and opinion regarding supervised off-ground passes does not provide the Court with enough information regarding these. There were a couple of examples given about passes with other patients, but there was not a plan or agenda on behalf of Mr. Wolst expressed; how often Mr. Wolst would go on these outings; will Mr. Wolst be with other patients; how long do they last; who and how many people will supervise; who will Mr. Wolst come in contact with; will they involve contact with a small or large group of people; will they entail situations where it will be difficult or easy to supervise. Additionally because of the need for medication and the risk and the grave consequences if there was to be a relapse or an escape, the Court would want Mr. Wolst's medication to be in a controlled environment including the receiving and actual taking of the medication.

The Court also finds that the transfer to the William White Unit is premature in order to assure Mr. Wolst's stability, recovery, and to protect him and so, I will need to proceed step by step without the danger of overloading him with too many options during his therapeutic course of treatment which includes the taking of medication as requirement for remission.

Based on the testimony of the witnesses during the hearing, this Court will allow unsupervised ground passes at the discretion of the Elgin Mental Health Center, but the request for supervised off-ground passes and the transfer to the William White Unit is denied."

Defendant appeals from the trial court's decision.

We first examine whether the trial court's decision was against the manifest weight of the evidence. Under section 5—2—4(g) of the Corrections Code, the defendant must prove by clear and convincing evidence that the facility director's determination supporting his transfer to a nonsecure setting or the entitlement to certain pass privileges is proper. 730 ILCS 5/5—2—4(g) (West 2000); *People v. Cross*, 289 Ill. App. 3d 876, 886, 684 N.E.2d 135 (1997). The trial court's determination as to whether a defendant has carried his burden under section 5—2—4(g) by clear and convincing evidence must be respected unless such determination is against the manifest weight of the evidence. *People v. Cross*, 301 Ill. App. 3d 901, 908-09 (1998). "For a decision to be against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trier of fact is clearly evident." *People v. Barwig*, 334 Ill. App. 3d 738, 743, 778 N.E.2d 350 (2002).

In the instant case, there is ample evidence to support the trial court's decision. The record makes clear that the trial court's primary concern was that defendant, when placed in a less secure environment and charged with taking his own medication, might fail to do so and relapse. Seltzberg and Stipes, defendant's own witnesses, testified that the sole reason defendant was not delusional, a danger to himself or to others, was because he took his daily medication, Risperidone, an antipsychotic agent. They both concluded that the Risperidone was the major reason for defendant's improvement. Seltzberg and Stipes also both testified that, if defendant stopped taking his medication, they would not be in favor of the transfer and the passes. Dr. Seltzberg said that the only thing that keeps defendant's symptoms from returning is the Risperidone and that defendant will likely need to take the drug forever. Dr. Singh stated that 25% of the patients who get the symptoms of paranoid schizophrenia relapse when they don't take their medication.

While all of the witnesses supported defendant's requests for relief, Seltzberg, Stipes, and Singh all testified that defendant could relapse and could potentially injure someone in the event he stopped taking his medication. The record made clear that one of the responsibilities of defendant, if transferred to WWC, would be the added responsibility of reminding staff that it was time for his medication. While there was some indication that this task would be monitored by WWC personnel, the clear objective of WWC is to transfer responsibilities back to the patients for the purpose of preparing them for release into the community.

Without question, the trial court determined that the grant of the transfer to WWC and the supervised off-grounds passes would overload defendant with too many responsibilities despite the witnesses' testimony to the contrary. As we noted above, the trial court expressed concern that the facility director's recommendation allowed three privileges all at once as opposed to privileges being granted one at a time. In its ruling, the trial court noted defendant's "great progress with medication," but found that the request for transfer was "premature" because a period was needed where defendant utilized unsupervised grounds passes at the Elgin facility while his medication was being fully monitored.

The trial court further held that the testimony and opinion regarding supervised off-grounds passes did not provide the court with sufficient information. The court noted that there was no plan or agenda expressed with regard to defendant that set forth: how often he would go on outings; whether he would be with other patients; how long the outings would last; who and how many people would supervise; who

defendant would come into contact with; whether the contact would involve a large or small group of people; and whether the situations would be easy or difficult to supervise.

The trial court also found that the transfer to WWC was premature in order to assure defendant's stability and recovery, "and to protect him and so, [the court] will need to proceed step by step without the danger of overloading [defendant] with too many options during his therapeutic course of treatment which include the taking or medication as a requirement for remission." The court then allowed the unsupervised grounds pass at Elgin.

In analyzing section 5—2—4(b), this court has held:

"The language of *** [section 5—2—4(b)] clearly gives the trial court wide discretion in granting and tailoring passes. The statute provides that the trial court *may* grant the passes, and *may* impose conditions on those passes. 730 ILCS 5/5—2—4(b) (West 1996). We agree with the State that requiring the trial court to grant the passes any time a defendant's treatment team requests them because the *team* believes they should be granted would defeat the purpose of the statute's language mandating that the passes *may* only be granted based on the *trial court's* approval. We therefore find that the clear language of the statute does not mandate that the trial court grant pass privileges solely because defendant's treatment team, including the facility director, recommends the passes be granted." (Emphasis in original.) *Cross*, 301 Ill. App. 3d at 910.

The *Cross* court, citing *People v. Williams*, 140 Ill. App. 3d 216, 226, 488 N.E.2d 649 (1986), also acknowledged, " 'it is the trier of fact, and not the psychiatrists, who is to consider and weigh all the evidence in [the] case.' " *Cross*, 301 Ill. App. 3d at 911.

■ In its ruling here, the trial court stated its concern about the safety of defendant and society at large. As we discussed above, the trial court was concerned with defendant's need for medication as a part of his treatment as well as to ensure his safety and the safety of others. As a result, the court determined that the request for transfer to WWC and the supervised off-grounds pass privilege were premature and could overload the defendant. We cannot say that this determination was against the manifest weight of the evidence because the opposite conclusion is not clearly evident under these facts.

In support of his position, defendant relies on *People v. Blumenshine*, 72 Ill. App. 3d 949, 391 N.E.2d 232 (1979), and *People v. Nelson*, 244 Ill. App. 3d 356, 614 N.E.2d 277 (1993).

*Blumenshine* considered whether the defendant, found not guilty by reason of insanity for the offense of murder, had established that

he was entitled to a petition for discharge under section 5—2—4(e) by clear and convincing evidence. 730 ILCS 5/5—2—4(e) (West 2000) (formerly, Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—4)). After a hearing involving the testimony of two psychiatrists who recommended discharge, the trial court denied the petition.

At the hearing, Dr. Pai, who directly treated the defendant, concluded that the defendant's psychosis was in remission and recommended that the defendant should be discharged subject to certain conditions. The testimony of Dr. Bornstein, the court-appointed psychiatrist, was consistent with the opinion and evaluation of Dr. Pai. The State concurred in defense counsel's recommendation that the defendant be discharged. The recommended discharge was conditioned upon the defendant living with his mother, continuing outpatient care, and continuing participation in rehabilitative alcohol treatment.

Despite the unanimous testimony by Dr. Pai and Dr. Bornstein and the State's concurrence, the trial court denied the discharge and rejected the expert's opinions doubting that the defendant could refrain from drinking, despite the condition that he continue in Alcoholics Anonymous, and doubting that the experts were correct in concluding that the defendant should live with his mother. The appellate court reversed because the trial court made its own determination that the three conditions could not be met "to the exclusion of adequate consideration of expert testimony." *Blumenshine*, 72 Ill. App. 3d at 953-54.

The facts in *Blumenshine* are distinguishable from those in this case. In *Blumenshine*, there was evidence that defendant had not consumed alcohol since he had been hospitalized and had been off his medication for eight months. Two psychiatrists in that case determined that the defendant had gained control over his psychotic symptoms and the alcohol abuse that contributed to them. The State even concurred in defense counsel's recommendation that defendant be discharged subject to the three conditions. Contrary to the witnesses' testimony and all of the evidence, the trial court had doubts that the defendant could avoid relapse because of the witnesses' inability to guarantee that the defendant would remain nondangerous or not violent.

Here, the evidence shows that defendant is progressing positively, but also indicates that defendant would relapse in the event he did not take his medication. As a result, he could become a danger to himself and to others. The trial court reasoned that a transfer to a nonsecure setting and allowing defendant to leave the grounds, even under the supervision of hospital staff, might place too much responsibility on defendant too quickly. As pointed out by the State, the trial court

granted the unsupervised on-grounds pass, a portion of the relief requested. The instant case does not place defendant in the "catch-22" paradox referred to in *Blumenshine* because all the evidence in *Blumenshine* established reasonable assurances for the safety of others, yet the trial court sought a guarantee from the two psychiatrists that the defendant would remain nonviolent. Here, the testimony of the evaluating medical personnel reveals that defendant is required to take medication for the rest of his life to avoid psychotic delusions. The testimony established that, in the event defendant failed to take his medication, the delusions that could lead to potentially violent behavior will return. Despite these facts, defendant argues that he is ready for the responsibility of taking his own medication in a nonsecure setting which could lead to his escape or to the injury of others. Thus, *Blumenshine* is distinguishable from this case.

Next, defendant relies upon *Nelson*, 244 Ill. App. 3d at 363, for the proposition that, "the statute [section 5—2—4 of the Corrections Code] sets up a strong presumption that the professional staff treating the defendant is best capable of determining the proper treatment for defendant." While *Nelson* states this proposition, it was considering a previous version of the statute. Under the Code at that time, the burden of proof rested with the State when a hearing was held to review that determination of the facility director that the defendant should be transferred to a nonsecure setting. Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g); *Nelson*, 244 Ill. App. 3d at 358-59. As we have indicated above, section 5—2—4(g) of the Code now states: "The burden of proof and the burden of going forth with evidence rest with defendant *** when a hearing is held to review the determination of the facility director that the defendant should be transferred to a nonsecure setting." 730 ILCS 5/5—2—4(g) (West 2000).

In *Nelson*, the facility director recommended the conditional release of the defendant, who had received over 10 years of inpatient psychological treatment after his acquittal for murder by reason of insanity. Under the Code at that time, the State had the burden of proving that the facility director's recommendation was improper. The State presented only one witness, a police detective, who testified to the facts of the murder. The witness admitted that he had not spoken to the defendant since the defendant's trial, more than a decade before the hearing on the defendant's conditional release. The witness also admitted that he had no training in the area of mental health.

On the defendant's behalf, the acting deputy facility director testified that, if granted conditional release, the defendant would be accepted at a halfway house where the staff would assure that the defendant took his medication daily. Dr. Block, a psychiatrist, testified

that he had been exposed to the defendant daily for the past year and a half. He opined that the defendant suffered from paranoid schizophrenia, but the illness was in remission and he was not dangerous. He emphasized that the defendant's medication at the halfway house would be supervised and that, if the defendant stopped taking his medication, he would begin to decompensate and show signs of psychosis, but that staff at the halfway house would be able to observe any sign of decompensation. Later, the trial judge asked Block if he could guarantee the defendant would take his medication if left the responsibility and if he could guarantee that the defendant would not attack anybody. Block said he could not. Dr. Kelly, medical director of the outpatient clinic where defendant would receive treatment, also evaluated defendant and found the defendant suitable for conditional release. He said that the staff and the halfway house would give him his medication and watch him take it daily.

Despite the testimony of these doctors, the trial court ruled that the evidence was insufficient to meet the defendant's burden of showing that he was no longer a danger to himself and to others.

On review, the appellate court determined that, under the Code at that time, the State had the burden to show that the petition for conditional release was inappropriate. *Nelson*, 244 Ill. App. 3d at 362. The court noted that the State presented only one witness and no evidence, apart from testimony regarding the killing, which occurred over a decade ago. *Nelson*, 244 Ill. App. 3d at 363. On the other hand, defendant's three witnesses, all qualified experts who evaluated the defendant's mental condition, testified in support of the recommendation provided the defendant took his medication. *Nelson*, 244 Ill. App. 3d at 363. Ultimately, the appellate court found that the trial court contravened the express statutory language by imposing the burden of proof upon defendant. *Nelson*, 244 Ill. App. 3d at 363. It also concluded that the State did not effectively impeach the witnesses' testimony that, if the defendant avoided medication at the halfway house, staff would observe the behavior and impose medication. *Nelson*, 244 Ill. App. 3d at 365. It further found that the State failed to counter the witnesses' consistent testimony that, when defendant was medicated, he was not a danger to himself or others. As a result, the trial court was reversed. *Nelson*, 244 Ill. App. 3d at 365.

We do not find *Nelson* controlling because it was decided when the burden of proof rested with the State, unlike the current statute (section 5—2—4(g)), which requires a defendant to prove by clear and convincing evidence that the facility director's recommendation was proper. Moreover, Seltzberg's testimony reveals that she was not very familiar with the procedure at WWC, saying, she "believe[d]" that the

staff at WWC made sure patients took their medication. Thus, the assurance in this case that defendant would be administered his medicine if unwilling to do so himself is absent, unlike *Nelson*, where it was stated that the halfway house would impose intramusuclar medication if necessary. *Nelson*, 244 Ill. App. 3d at 365. As a result, we find *Nelson* to be distinguishable on this additional ground.

Finally, defendant argues that the trial court failed to apply a three-pronged standard for the two denied requests under section 5—2—4(b) of the Code. 730 ILCS 5/5—2—4(b) (West 2000). Defendant claims that the applicable standard for each request is whether the request "reasonably assure[s] the defendant's satisfactory progress in treatment and the safety of defendant and others." 730 ILCS 5/5—2—4(b) (West 2000). From this language, defendant gleans a three-pronged test requiring: (1) "the proposed privilege must reasonably assure the safety of the defendant"; (2) "the proposed privilege must assure the safety of others"; and (3) "the proposed privilege must reasonably assure the defendant's satisfactory progress in treatment."

According to defendant, this three-pronged inquiry must be independently applied by the trial court for the requested relief. Defendant contends that the evidence overwhelmingly supported these requirements. We disagree with this conclusion, and because defendant has cited no authority for this proposition, the issue has been waived under Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)). *People v. Ford*, 301 Ill. App. 3d 56, 59, 703 N.E.2d 436 (1998).

In sum, there was evidence in the record to support both the trial judge's decision to allow for the unsupervised on-grounds pass and the denial of the transfer and the supervised off-grounds pass. We therefore find that defendant failed to meet his burden that the two privileges denied should have been granted. As a result, the trial court's determination to deny the two privileges at issue was not against the manifest weight of the evidence.

■ Defendant next argues that the current version of section 5—2—4(g), as amended by Public Act 91—770 (Pub. Act 91—770, eff. January 1, 2001), should not have been applied to him because the retroactive application of this new statute is a substantive change in the law. Defendant contends that the amended version of the statute imposes a new burden upon him that he had no notice of when he was found not guilty by reason of insanity and that violates section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2000)). Section 4 of the Statute on Statutes provides:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty,

forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes affect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding. If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect. This section shall extend to all repeals, either by express words or by implication, whether the repeal is in the act making any new provision upon the same subject or in any other act." 5 ILCS 70/4 (West 2000).

The current version of section 5—2—4(g) states:

"The findings of the Court shall be established by clear and convincing evidence. The burden of proof and the burden of going forth with the evidence rest with the defendant *** when a hearing is held to review the determination of the facility director that the defendant should be transferred to a non-secure setting ***." 730 ILCS 5/5—2—4(g) (West 2000).

The prior version of section 5—2—4(g) stated:

"The findings of the court shall be established by clear and convincing evidence. The burden of proof and the burden of going forth with the evidence rest with the State when a hearing is held to review the determination of the facility director that the defendant should be transferred to a non-secure setting ***." 730 ILCS 5/5—2—4(g) (West 1998).

As outlined above, prior to the enactment of Public Act 91—770, the burden of proof was on the State when a hearing was "held to review the determination of the facility director that the defendant should be transferred to a non-secure setting." 730 ILCS 5/5—2—4(g) (West 1998).

Under the current law, section 5—2—4(g) places the burden on the defendant to present evidence and convince the court that a change in status should be granted. 730 ILCS 5/5—2—4(g) (West 2000).

On this issue, defendant first claims that the correct timing for purposes of a retroactivity analysis is "not when the Facility Director triggered the hearing, but when defendant made the decision to plead not guilty by reason of insanity," which occurred years before the current law became effective. Defendant next contends that at the time he pled "not guilty by reason of insanity, he had reason to believe that if he conformed his behavior to maximize psychiatric treatment, the Facility Director would trigger the hearing necessary for [defendant] to continue progressing in treatment." Defendant further contends

that, at the time he pled not guilty by reason of insanity, he was under the belief that, upon being found not guilty by reason of insanity, he would be committed to a state psychiatric institution and that the facility director "would control his treatment unless the State[']s Attorney could prove the treatment did not adequately provide for public safety." Therefore, defendant claims he was denied notice that his decision to plead not guilty by reason of insanity would result in him carrying the burden of proof to demonstrate "the adequacy of the Facility Director's determinations regarding his therapeutic progress." According to defendant, this change in the burden of proof is an improper retroactive application of a statute that violates section 4 of the Statute on Statutes.

The State responds that section 5—2—4(g), as currently codified, was properly applied because the amendment had already taken effect when the recommendations of the facility director were made. Further, it contends that section 5—2—4(g) was not triggered by the commission of the offenses or by the defendant's decision to plead not guilty by reason of insanity, but by the facility director's recommendations, which occurred in 2002. Finally, the State claims that the application of section 5—2—4(g) does not violate section 4 of the Statute on Statutes because it is a procedural change that affects hearings on a defendant's mental condition and is not a substantive change that has a true retroactive impact.

The State relies upon criteria set forth in *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 39, 749 N.E.2d 964 (2001), to argue that this amendment is procedural in nature, does not affect defendant's substantive rights, and does not violate section 4 of the Statute on Statutes. Before discussing *Commonwealth Edison*, we must decide at what point to begin the retroactivity analysis and whether such an analysis is applicable under these facts.

Defendant contends that the analysis begins at the time he was found not guilty by reason of insanity, while the State argues that it begins at the time of the hearing triggered by the facility director's recommendations. We agree with the State's position for several reasons.

Defendant does not cite a single case to support his conclusion that "the appropriate timing *** for retroactivity is the time when [defendant] made the decision to plead not guilty by reason of insanity." Failure to cite to any relevant authority in support of an argument results in its waiver. *People v. Davis*, 335 Ill. App. 3d 1, 20, 779 N.E.2d 443 (2002).

Next, while our research has revealed no authority directly on point, a decision involving a comparable statute supports the State's

position that a retroactivity analysis would begin at the time of the hearing triggered by the facility director's recommendations.

*In re Detention of Samuelson*, 189 Ill. 2d 548, 558-59, 727 N.E.2d 228 (2000), involved proceedings under the Illinois Sexually Violent Persons Commitment Act (SVPCA) (725 ILCS 207/1 *et seq.* (West 1998)). The SVPCA permits the State "to extend the incarceration of criminal defendants beyond the time they would otherwise be entitled to release if those defendants are found to be 'sexually violent.' " *In re Detention of Samuelson*, 189 Ill. 2d at 552.

Under the SVPCA, a person is considered a sexually violent person, and therefore subject to extended incarceration, if he or she "has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and *** is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2000).

One of the issues in the *Samuelson* case was whether the SVPCA violated *ex post facto* principles under the United States Constitution. For the purposes of its analysis, the supreme court observed that the provisions of the SVPCA are triggered "when a defendant who has been *** found not guilty of a sexually violent offense by reason of insanity is nearing release or discharge from custody." *In re Detention of Samuelson*, 189 Ill. 2d at 553. It further found that the SVPCA did not have a retroactive effect because a "defendant cannot be involuntarily committed based on past conduct." *In re Detention of Samuelson*, 189 Ill. 2d at 559. Specifically, the court found that "[i]nvoluntary confinement is permissible only where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence in the future." *In re Detention of Samuelson*, 189 Ill. 2d at 559. On this ground, the court rejected the defendant's *ex post facto* challenge. *In re Detention of Samuelson*, 189 Ill. 2d at 559.

Similarly, we find that section 5—2—4 is triggered when the facility director makes a recommendation that a change be made in a defendant's commitment status resulting in a subsequent hearing on defendant's mental fitness for the requested privileges. As in *In re Detention of Samuelson*, defendant here suffers from a present mental disorder and the disorder continues to create a concern that he will engage in acts of violence in the future. As a result, defendant's continued commitment is not based on past conduct but, rather, his present mental condition.

Third, a serious question is raised as to whether the amended ver-

sion of section 5—2—4(g) could have any retroactive effect in the instant case because the statute became effective well before the facility director recommended a change in defendant's confinement status. Section 5—2—4(g) became effective on January 1, 2001, more than one year before the facility director made his recommendations on January 23, 2002.

Finally, there is other authority which suggests that the statute was not retroactively applied in this case. In *Commonwealth Edison*, cited above, the supreme court addressed the issue of whether certain tax rate amendments to the Counties Code (55 ILCS 5/5—1024 (1994)) and the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/9—107 (West 1994)) should be given retroactive application. In discussing whether a statute can be applied retroactively, the court held:

> " 'A statute is not applied "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment [citation] or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and the extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.' " *Commonwealth Edison*, 196 Ill. 2d at 39, quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 269-70, 128 L. Ed. 2d 229, 254-55, 114 S. Ct. 1483, 1499 (1994).

In the instant case, the amendment to section 5—2—4(g), which shifts the burden of proof to defendant, did not attach new legal consequences to defendant's murder conviction or to his decision to plead not guilty by reason of insanity. It was the facility director's recommendations that triggered a hearing on the issue of defendant's present mental condition, not the finding of not guilty by reason of insanity. Section 5—2—4(g) was amended more than one year before those recommendations were ever made. We therefore conclude that the new version of section 5—2—4(g) had no retroactive effect.

As further support we have reviewed *People v. Valdez*, 79 Ill. 2d 74, 81, 402 N.E.2d 187 (1980), which reinforces our conclusion that the amendment to section 5—2—4(g) did not have a true retroactive impact under these facts. In *Valdez*, the supreme court addressed the issue of whether an amendment to section 5—2—4 could be applied retroactively in instances where the offense that served as the basis for the defendant's acquittal of not guilty by reason of insanity was committed prior to the effective date of the amendment to the statute.

On May 3, 1978, following a bench trial, the defendant in *Valdez* was acquitted by reason of insanity for murdering two individuals on April 3, 1977, and April 4, 1977, respectively. After a hearing on May 11, 1978, the defendant was placed into a mental health center for treatment. At the time of the murders, section 5—2—4(b) of the Corrections Code provided that, in the event of an acquittal, the trial court shall enter an order hospitalizing the defendant for an initial period not to exceed 12 months. At the time of the defendant's trial, section 5—2—4 had been amended, effective August 1, 1977, to provide that, in the event of an acquittal of not guilty by reason of insanity, a hearing was to be held to determine whether the defendant was in need of mental treatment. If the trial court found that the defendant was in need of mental treatment, the trial court could commit the defendant for an indefinite period, not to exceed the period of confinement, subject to certain criteria, had he been convicted. In response to a notice, dated November 1, 1978, that the Department was considering granting the defendant off-grounds privileges, the State's Attorney requested a hearing under the amended statute. After an evidentiary hearing, the trial court denied the requested privileges. The defendant argued that the retroactive application of the amended statute violated rules of statutory construction and equal protection.

The supreme court rejected the application of the amended statute as retroactive, stating that " 'it is well established that a statute is not retroactive just because it relates to antecedent events. [Citations.]' " *Valdez*, 79 Ill. 2d at 81, quoting *Sipple v. University of Illinois*, 4 Ill. 2d 593, 597 (1955). It further stated, "[t]he occurrence which invoked the provisions of the statute was not the commission of the offenses with which defendant was originally charged." *Valdez*, 79 Ill. 2d at 81. Thus, the court found that the amendment to section 5—2—4 did not have a retroactive effect. The reasoning in *Valdez* was adopted by the appellate court in a similar case. See *People v. Thiem*, 82 Ill. App. 3d 956, 960, 403 N.E.2d 647 (1980). Based upon all of the above, we conclude the statute was not applied retroactively.

Additionally, even if we were to conduct a retroactivity analysis in this case, we find that the amendment to section 5—2—4(g) is procedural in nature and does not violate section 4 of the Statute on Statutes. In *Commonwealth Edison*, the Illinois Supreme Court, for the first time, adopted the retroactivity analysis established by the United States Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994), for purposes of determining whether an amendment to a statute can be retroactively applied. *Commonwealth Edison*, 196 Ill. 2d at 39. In doing so, the *Commonwealth Edison* court said:

"Under the *Landgraf* test, if the legislature has clearly indicated what the temporal reach of an amended statute should be, then, absent a constitutional prohibition, that expression of legislative intent must be given effect. However, when the legislature has not indicated what the reach of a statute should be, then the court must determine whether applying the statute would have a retroactive impact, *i.e.*, 'whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.' [Citation.] If there would be no retroactive impact, as that term is defined by the court, then the amended law may be applied. [Citation.] If, however, applying the amended version of the law would have a retroactive impact, then the court must presume that the legislature did not intend that it be so applied. [Citation.]" *Commonwealth Edison*, 196 Ill. 2d at 38.

The language relied upon by the State in *Commonwealth Edison*, quoting *Landgraf*, states, "retroactivity is a matter on which judges tend to have 'sound ... instinct[s],' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Commonwealth Edison*, 196 Ill. 2d at 39, quoting *Landgraf*, 511 U.S. at 269-70, 128 L. Ed. 2d at 255, 114 S. Ct. at 1499.

The State claims that Public Act 91—770, or the current amendment of section 5—2—4(g), did nothing to deprive defendant of fair notice because defendant had no control over the triggering of the recommendations made by the facility director. In essence, the State claims that a change in defendant's privileges was within the exclusive purview of the facility director. Thus, prior to any recommendation by the facility director, a change in the burden of proof requiring defendant to show the facility director's recommendation was proper did not violate defendant's right to fair notice. The State explains that defendant's contention that he was denied fair notice is to claim that he would have behaved differently before January 1, 2001, if he had known the burden of proof was going to change. However, prior to January 1, 2001, defendant had no control over his own fate absent a recommendation for change in privileges by the facility director. Therefore, the State claims that defendant cannot assert that a change in the burden of proof denied him fair notice under these circumstances.

The State also asserts that defendant's reasonable reliance on the old statute did not affect his substantive rights in the instant case for the same reason that he was not deprived of fair notice. Under these facts, the State claims that defendant cannot argue he reasonably relied upon the former statute because, even under the old statute, he

had no control over whether the facility director would trigger a hearing and subsequent recommendation for privileges.

Finally, the State contends that settled expectations, or the third element set forth above, means that "stability in the law promotes reliable planning, which is good for society." See *Landgraf*, 511 U.S. at 271, 128 L. Ed. 2d at 256, 114 S. Ct. at 1500. Again, the State claims that defendant could not have had "any settled expectations as to the consequences of the actions he took before the law changed on January 1, 2001, because he had no control over whether the director would trigger a hearing by making a recommendation that he be transferred." The State points out that the facility director's recommendation did not occur until January 23, 2002, more than a year after section 5—2—4(g) was amended; thus, defendant could not have expected that a favorable recommendation would come before the statute was amended. The State points out that the amendment of section 5—2—4(g) could not have disturbed any settled expectation of defendant's. Based on the above, the State concludes that section 5—2—4(g) is procedural in nature and that its retroactive application did not affect defendant's substantive rights or violate section 4 of the Statute on Statutes. We agree for two reasons.

First, defendant concedes that the amendment, which shifts the burden of proof, is a procedural change. Nevertheless, he argues the fact that an amendment to a statute is procedural in nature does not end the inquiry and that his substantive rights have been affected. He contends that applying section 5—2—4(g) retroactively affected his substantive rights because, at the time he pled not guilty by reason of insanity, he "could not have known that this action would result in the legal consequence of him carrying the burden of proof to demonstrate the adequacy of the Facility Director's therapeutic proposals." As we noted above, however, defendant cites no authority for the proposition that the correct timing of the retroactivity analysis was when defendant decided to plead not guilty by reason of insanity. Thus, we reject this argument.

Second, we agree with the State's analysis that defendant's substantive rights of fair notice, reasonable reliance, and settled expectations set forth in *Commonwealth Edison* have not been affected. As the State points out, once the defendant was placed into Elgin, the most he could control was his own behavior in the hope that the facility director would someday recommend that he be transferred to a less secure facility. Therefore, a change in the law shifting the burden of proof to defendant for the purpose of showing that the facility director's decision was proper did not impact defendant's substantive rights. We conclude the amendment to section 5—2—4(g) is

procedural in nature and its application in this case does not violate section 4 of the Statute on Statutes.

■ We next address whether, by shifting the burden of proof to defendant, the application of amended section 5—2—4(g) violated defendant's substantive due process rights under the due process clause of the United States Constitution. As we noted above, the constitutionality of a statute is a question of law that we review *de novo. People v. Malchow*, 193 Ill. 2d 413, 418, 739 N.E.2d 433 (2000). Additionally, statutes are presumed constitutional and the party challenging the constitutionality of a statute bears the burden of rebutting the presumption. *People v. Maness*, 191 Ill. 2d 478, 483, 732 N.E.2d 545 (2000).

As a preliminary matter, defendant, in his reply brief, asserts that he is not claiming that his substantive due process rights were violated. However, the first sentence in section VI of his opening brief states, "in addition to violating the substantive Due Process requirements outlined in *Foucha*, Public Act 91—770 also violates procedural due process." Thus, we will assume that defendant is making a substantive due process claim and address it.

As noted by the State, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of fairness of the procedures used to implement them.' [Citation.]" *Zinermon v. Burch*, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 113, 110 S. Ct. 975, 983 (1990). In addition, " ' [t]he substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.' [Citations.]" *Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002).

Under the due process clause, the State may not confine a defendant once it has been determined that he is no longer mentally ill and dangerous. *Foucha v. Louisiana*, 504 U.S. 71, 77, 118 L. Ed. 2d 437, 446, 112 S. Ct. 1780, 1784 (1992). On the other hand, "the Constitution permits the Government, on the basis of the insanity judgment, to confine [a defendant] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones v. United States*, 463 U.S. 354, 370, 77 L. Ed. 2d 694, 709, 103 S. Ct. 3043, 3052-53 (1983).

We agree with the State that the way in which the government determines whether a defendant should remain confined is a matter of procedural due process. In *Addington v. Texas*, the United States Supreme Court held that, "[a]s the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum." *Addington*

*v. Texas*, 441 U.S. 418, 431, 60 L. Ed. 2d 323, 334, 99 S. Ct. 1804, 1812 (1979). The court then went on to hold that the use of a " 'clear, unequivocal, and convincing' " evidence standard of proof in a civil commitment proceeding was constitutionally adequate. *Addington*, 441 U.S. at 433, 60 L. Ed. 2d at 335, 99 S. Ct. at 1813. Therefore, *Addington* makes clear that the burden of proof at a commitment hearing is an issue of procedure, not substance.

The defendant does not rely upon any authority where the burden of proof in a civil commitment proceeding was treated as a matter of substantive due process. Defendant argues that section 5—2—4(g) is unconstitutional because it places the burden of proof on defendant, even when the State has determined that the original basis for confining defendant in a secure setting no longer exists. According to defendant, requiring him to prove, by clear and convincing evidence, that he no longer requires placement in a secure setting violates the due process clause of the fourteenth amendment to the United States Constitution. U.S. Const., amend XIV.

In support of this argument, defendant relies upon the United States Supreme Court decision in *Foucha*, cited above. However, defendant's reliance upon *Foucha* is misplaced.

In *Foucha*, it was undisputed that the defendant was no longer mentally ill under the State of Louisiana's not-guilty-by-reason-of-insanity statute, yet the State sought to continue to confine the defendant on the basis of his antisocial personality. The court held that "the State must establish insanity and dangerousness by clear and convincing evidence *in order to confine an insane convict beyond his criminal sentence, when the basis for his original confinement no longer exists.*" (Emphasis added.) *Foucha*, 504 U.S. at 86, 118 L. Ed. 2d at 1788, 112 S. Ct. at 452. Thus, *Foucha* required that, if the State wanted the continued commitment of the defendant despite the fact that he was no longer considered mentally ill, it had to proceed through a civil commitment hearing and establish the defendant's insanity and dangerousness by clear and convincing evidence. The Court also held that the defendant "[could] no longer be held as an insanity acquitee in a mental hospital, [and was] entitled to constitutionally adequate *procedures* to establish the grounds for his confinement." (Emphasis added.) *Foucha*, 504 U.S. at 80, 118 L. Ed. 2d at 1785, 112 S. Ct. at 447. Thus, *Foucha* reinforces the conclusion that the burden of proof in a civil commitment proceeding is procedural and not substantive in nature.

Defendant suggests that *Foucha* stands for the proposition that "a state statute violates the Due Process Clause *** if it places on an insanity acquitee the burden of proof in a hearing for his release once

the state itself has found that the basis for his initial commitment no longer exists." This statement is a misinterpretation of *Foucha* and section 5—2—4(g) in the instant case. *Foucha* clearly places the burden on the State to establish, by clear and convincing evidence, a defendant's insanity and dangerousness when the basis for his original confinement no longer exists. *Foucha* does not prohibit a state statute that places the burden on a defendant to prove by clear and convincing evidence that he is no longer in need of confinement. In *Foucha*, the State conceded that the defendant was no longer mentally ill. Thus, at issue was the State's burden to continue the defendant's confinement, not on the basis of his mental illness, but on the basis of his antisocial personality, which was not the ground for his original confinement.

In the instant case, the State correctly contends that section 5—2—4 "gives the facility director the power to trigger a hearing," but reserves for the trial court "the ultimate decision of whether an *** acquitee is still mentally ill and dangerous." See 730 ILCS 5/5—2—4(h) (West 2000). Thus, here, the question of whether defendant was in need of further commitment was still viable and was properly within the discretion of the trial court. We therefore find that defendant's reliance on *Foucha* is misplaced and we reject defendant's substantive due process claim.

Last we examine whether section 5—2—4(g), as amended, violates procedural due process by failing to ensure adequate safeguards for the protection of defendant's liberty interest in being free from confinement in a secure setting. Once again, the constitutionality of a statute is a question of law that we review *de novo*. *Malchow*, 193 Ill. 2d at 418. Moreover, statutes are presumed constitutional and the party challenging the constitutionality of a statute bears the burden of rebutting the presumption. *Maness*, 191 Ill. 2d at 483.

Defendant argues that section 5—2—4(g), as amended, violates procedural due process because it "creates inadequate procedural safeguards against the deprivation of an insanity acquitee's liberty interest in being free from confinement in a secure setting." The State responds that the statute comports with due process requirements.

As noted by the parties, the seminal case on procedural due process law is *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). *Mathews* set forth three distinct factors to be considered for the purpose of protecting individuals from an erroneous deprivation of a property or liberty interest: (1) the private interest that will be affected by the individual action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the

probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903.

We note that seven years after *Mathews*, the Illinois Appellate Court upheld the constitutional validity of the prior version of section 5—2—4 which placed the burden on a not guilty by reason of insanity acquitee when the acquitee made the request for a change in confinement conditions. *In re King*, 114 Ill. App. 3d 346, 351, 448 N.E.2d 887 (1983). Specifically, the *King* court stated, "we believe that a statute requiring the petitioner to bear the burden of proof in showing a change of condition in a release hearing does not violate the petitioner's constitutional right to due process." *King*, 114 Ill. App. 3d at 351.

Further, the federal court of appeals determined that a federal statute that placed the burden on a not-guilty-by-reason-of-insanity acquitee to prove that he was no longer mentally ill or dangerous did not violate due process rights after weighing the three factors set forth in *Mathews*. *United States v. Wattleton*, 296 F.3d 1184, 1201 (11th Cir. 2002).

With regard to the first *Mathews* factor, the *Wattleton* court observed that commitment constituted a significant deprivation of liberty requiring due process protection. However, the court noted that this concern was offset by countervailing factors ameliorating the negative effects on the insanity acquitee's private interests. For instance, the court noted that the defendant was committed in a facility where he would receive the benefits of hospitalization, care, and treatment. *Wattleton*, 296 F.3d at 1199.

Concerning the second *Mathews* factor, the court in *Wattleton* noted that the difficulty of predicting whether a person is no longer mentally ill and dangerous exists regardless of which party had the burden of proof. *Wattleton*, 296 F.3d at 1199. But the court noted that practical considerations support allocating the burden of proof to the insanity acquitee. As part of the assessment of the acquitee's mental illness and dangerousness, mental health experts examine the insanity acquitee. If the government were to bear the burden of proof, these risk assessments could be impeded by an acquitee who was reluctant or unwilling to participate in the process. However, if the acquitee bears the burden of proof, he has an incentive to cooperate in the mental examination. *Wattleton*, 296 F.3d at 1200.

Finally, with regard to the third *Mathews* factor, the *Wattleton* court stated, "[t]he government undoubtedly has a strong interest in

safeguarding society from individuals who pose a danger to persons or property because of their mental illness." *Wattleton*, 296 F.3d at 1200. The court also noted the government's interest in avoiding relitigation of the trial at the dangerousness hearing. *Wattleton*, 296 F.3d at 1200-01. It further repeated the concern that, in the event the burden were on the government, the government could potentially confront an insanity acquitee who is unwilling to cooperate in a necessary mental examination. *Wattleton*, 296 F.3d at 1201. The court then concluded that, after weighing all of the *Mathews* factors, the federal statute placing the burden on the insanity acquitee to prove his readiness for change in confinement did not violate his due process rights. *Wattleton*, 296 F.3d at 1201.

Based on the holdings in *King* and *Wattleton*, and the factors in *Mathews*, we find that section 5—2—4 did not violate defendant's procedural due process rights.

Based on the above, we find that the factors for consideration established in *Mathews* have been satisfied and that section 5—2—4(g), as amended, does not unfairly deprive defendant of his liberty interest in violation of the due process clause.

The judgment of the trial court is affirmed.

Affirmed.

O'MALLEY, P.J., and GORDON, J., concur.