2021 IL App (2d) 191090-U
No. 2-19-1090
Order filed June 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 10-CF-2643 |
| MARCI M. WEBBER, | ) ) ) | Honorable George Bakalis, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that defendant was not a danger to herself was against the manifest weight of the evidence and therefore its grant of conditional release was error.

¶ 2    The State appeals the trial court's granting of defendant's (Marci M. Webber) petition for discharge or conditional release. The State contends that defendant still suffers from delusions and is a danger to herself and others such that she would benefit from inpatient care. The trial court relied on Dr. Lesley Kane's testimony as support for its findings that defendant should be granted

conditional release. Based on our review of that testimony, the trial court's findings are not supported by the manifest weight of the evidence. For the reasons that follow, we reverse.

¶ 3                                   I. BACKGROUND

¶ 4        On November 3, 2010, defendant murdered her four-year old daughter, Magdalene. She thought that Satan was going to kidnap Magdalene for the purpose of sexual gratification. Defendant cut Magdalene's neck in her mother's bathroom and inscribed words on the walls in blood. On November 10, 2010, defendant was indicted on five counts of first-degree murder.

¶ 5        On June 7, 2012, defendant was found not guilty by reason of insanity (NGRI). She was remanded to the custody of the Illinois Department of Human Services (DHS) pursuant to section 5-2-4 of the Uniform Code of Corrections (730 ILCS 5/5-2-4 (West 2012)) (Code) for an evaluation as to whether she was in need of mental health services. On July 13, 2012, the trial court found defendant was in need of mental health services pursuant to section 5-2-4(a-1)(B) of the Code. 730 ILCS 5/5-2-4(a-1)(B) (West 2012). Defendant was initially receiving treatment at Elgin Mental Health Center but was moved to Chicago-Read to continue treatment.

¶ 6        On August 22, 2017, after five years of treatment, defendant filed a motion for discharge or conditional release and asked the court to consider her petition under the auspices of section 5-2-4(g) of the Code. 730 ILCS 5/5-2-4(g) (West 2016). After a hearing on November 13, 2017, the trial court denied defendant's petition as it was unconvinced she was ready for discharge. The trial court said that "[w]hat is appropriate is for DHS to do what should have been done some time ago *** establish a plan for [defendant's] eventual transition into society." Two days after the trial court's denial of defendant's petition, she attempted to kill herself by ingesting 30 Fioricet pills. Thereafter, on November 27, 2017, defendant was transferred back to Elgin Mental Health Center.

On August 1, 2019, this court affirmed the trial court's denial of defendant's petition. See *People v. Webber*, 2019 IL App (2d) 170998-U.

¶ 7    During the pendency of that appeal, defendant filed another petition for discharge, or in the alternative, conditional release. She subsequently filed two amended petitions for conditional release or discharge in July 2018. Defendant's second amended petition requested the trial court to consider evidence regarding her treatment plan, and whether she met the criteria for inpatient treatment pursuant to section 5-2-4 of the Code. 720 ILCS 5/5-2-4 (West 2018). In response to defendant's amended petition, the trial court ordered Dr. Lesley Kane to conduct an independent evaluation of defendant prior to a hearing on her second amended petition for conditional release.

¶ 8    On May 8, 2019, the trial court began a bench hearing on defendant's second petition for conditional release or discharge. Defendant called three expert witnesses to testify. The first was Dr. Toby Watson, a clinical psychologist and expert in forensic outcome studies as it relates to severe mental illness. Watson was hired to examine defendant on three different occasions; August 17, 2015, July 5, 2017, and March 21, 2018.[1] Watson's testimony was based on reports he created following examination of defendant on those dates.

¶ 9    Watson opined that defendant does not suffer from a mental illness and is not a danger to herself or others. In 2015, he diagnosed defendant with post-traumatic stress disorder and alcohol dependence by history but stated that she was not dependent on alcohol at the time of his testimony

---

[1] Dr. Watson's testimony concerning the August 17, 2015, and July 5, 2017, examinations of defendant was largely duplicative of testimony given at the November 13, 2017, hearing on defendant's August 22, 2017, petition for conditional release or discharge. *People v. Webber*, 2019 IL App (2d) 170998-U, ¶ 7, 8.

due to her having completed the mental illness substance abuse program during inpatient treatment. Watson did not believe defendant would use alcohol again if discharged. Regarding defendant's post-traumatic stress disorder, Watson testified that defendant's trauma stemmed from "verbal and physical abuse from her parents, *** from being abused from her husbands[,] *** from custody battles[,] *** from the fact that she killed her daughter and doesn't believe that she was mentally ill, that it was actually *** withdrawal from medication ***." Watson further opined that defendant's post-traumatic stress disorder could have been caused from being involuntarily medicated while in inpatient care. Watson reiterated that these traumas did not make defendant mentally ill or a danger to herself or others. He denied the assertion that defendant was under the influence of alcohol when she killed her daughter. He believed that she suffers from underlying depression. Watson acknowledged defendant's November 2017 suicide attempt following the denial of her prior petition for discharge but described it as, while serious, a singular event. He believed that defendant should be transitioned to an outpatient mental health facility and acknowledged that she would need to check in daily due to the stress of finding an apartment and a job.

¶ 10    Defendant next called Dr. Gail Tasch, a board-certified psychiatrist, to testify. Tasch was referred to defendant by Dr. Watson and met with her on one occasion at Elgin Mental Health Center for the purpose of preparing a report and opinion as to whether defendant qualified for release. Tasch testified that she had also spoken to defendant numerous times by phone. Based on her experience and interactions with defendant, Tasch opined that defendant does not suffer from a major mental illness, nor does she have symptoms of a major mental illness. She further opined that defendant "does not have any suicidal thoughts[,] *** no thoughts of wanting to hurt herself or anybody else, no suicide or homicidal thoughts." Based on her review of defendant's record of

inpatient treatment and Dr. Watson's report, she did not believe defendant to be a danger to herself or others.

¶ 11    Tasch testified that she believed defendant's alcohol use to be a side effect of psychotropic medications. In her opinion, if defendant stayed away from those medications, she would not pose a danger. She did not agree with Dr. Watson's diagnosis of defendant's alcohol use disorder. Tasch believed that defendant understands the nature and character of her action but did not believe defendant needed mental health treatment.

¶ 12    Defendant then called psychologist Dr. Dathan Paterno to testify. Paterno conducted an in-person interview and psychological testing with defendant in October 2018. Additionally, Paterno stated that he had "probably 20 phone conversations" with defendant between October 2018 and the time of his testimony. He did not believe that defendant would use alcohol outside of a controlled environment "frequently or to a troublesome degree" as long as "she stayed off psychiatric medications, she would not need [alcohol] to counteract that." Although defendant will need psychotherapy for years, he opined that defendant does not suffer from a mental illness, nor is she a danger to herself or others.

¶ 13    Defendant then testified on her own behalf. She described having been physically attacked by other patients at Elgin Medical Health Center, as well as being called "baby killer" by patients during her time there. She recalled her suicide attempt on November 15, 2017, at Chicago Read following the denial of her discharge petition. She blamed the suicide attempt on "a lot of circumstances *** including *** a combination of medications, three different medications." Additionally, she "was very vulnerable." She had seen a report of her case on television news the described defendant as "severely mentally ill." She thought it would be better for her to take her

own life and "let her [daughter] sue for wrongful death." She admitted that the denial of her discharge petition also played a role in her suicide attempt.

¶ 14    Defendant denied suffering from any mental illness. She described her relationship with her psychiatrist at Elgin Mental Health Center, Dr. Richard Malis, as nonexistent as he refused to accept that defendant does not suffer from a mental illness and sought to administer psychotropic medications to treat defendant. She said that she would not be willing to take any medications prescribed because she knows "that [she is] not insane *** [and she is] not in need of medication." Although she admitted to experiencing paranoid and religious delusions at the time she killed Magdalene, she testified that she had not experienced any since. She further admitted to past alcohol abuse, including at the time of her crime, but did not believe she would abuse alcohol to cope with adversity in the future.

¶ 15    When asked what she would do if released, defendant responded

> "Well, I feel that I know myself very well. What I would like to do, because I understand the world is a little bit different now and I've been locked up for some time, I would like to transition by getting counseling.
>
> I need to be in my own home. I need a place of my own, an apartment, where I don't have people telling me what to do that don't know *** what's best for me or don't care. I'm tired of people. I'm exhausted from people. I just want some peace.
>
> I would like to go to a counselor, a one-to-one, to be able to *** grieve the death of my daughter that I've had to stuff all these years, grieve the death of my father that I was antagonized over the phone while he was dying, and to deal with my perception of humanity at this point."

¶ 16    Dr. Richard Malis, defendant's treating psychiatrist at Elgin Mental Health Center, was called to testify by the State. Malis believed that defendant needed mental health services on an inpatient basis. He opined that defendant was expected to inflict serious harm upon herself or others and diagnosed defendant with schizoaffective disorder bipolar type, alcohol use disorder, and borderline personality traits.

¶ 17    As to his diagnosis of schizoaffective disorder bipolar type, Malis explained that defendant met this diagnosis through continued delusional ideas and disorganized thinking. Defendant's symptoms of this diagnosis started before she killed her daughter and continued throughout her treatment. Malis described defendant's delusional beliefs concerning a conspiracy by the church to harm her daughter. He further described defendant's fixed false beliefs about being mistreated by the legal system during her child custody battles with her ex-husband before she killed Magdalene. Following her crime, defendant continued to demonstrate these delusional beliefs when she believed one of her pyschologists was part of the mafia and Illuminati, conspiring with the courts in her custody battles. Her delusional beliefs continued after being committed by maintaining that she was being tortured deliberately by her treatment providers and hospital staff. Malis opined that defendant's demonstration of "flight of ideas and pressured speech" further evidences this diagnosis.

¶ 18    Malis described the bipolar component of defendant's diagnosis as depressive episodes evidenced by depressed mood, at times with sleep disturbance, changes in weight and appetite, and loss of interest in different activities. Malis recalled defendant had periods of time where she is crying and tearful and describes being sad. She experiences periods of sleep disturbance where she tends to not go to sleep until very late in the evening and not get out of bed until noon the

following day, often taking naps the following afternoon. Malis stated that defendant had exhibited chronic increase in appetite and exhibited a lack of interest in most activities.

¶ 19    Malis recommended defendant take psychotropic medications but she has refused. He testified that the goal of the medications was to reduce symptoms of her delusional beliefs, disorganized thinking, and mood disorder symptoms. He observed that defendant was taking psychotropic medications following the murder of her daughter. She exhibited less of the delusional beliefs and better controlled her mood disorder symptoms when talking these medications. Additionally, defendant seemed less irritable, had more stable moods, engaged in treatment, and her reports exhibited less conflict with hospital staff. Malis opined that psychotropic medication had a positive effect on defendant.

¶ 20    Malis testified that defendant does not have insight into her mental illness. He stated that defendant believes her delusional ideas and is unable to consider the possibility that they are not true. Defendant's refusal to participate in the recommended therapy further exacerbates this problem. She does not attend group therapy regularly. She does not participate in individual therapy at all. She has refused to meet with Malis except once every several weeks as a requirement for the grant of certain hospital privileges. At the time of Malis's testimony, defendant had not met with him in about a year, and she was not currently meeting with her psychologist for any sort of therapy as she was not interested. Malis gave defendant a list of goals each week, including a non-hostile interaction with her social worker. The week prior to his testimony was the first time defendant had met that goal.

¶ 21    Malis testified that defendant has a lack of insight into her alcohol abuse disorder. He recommended treatment to defendant as individuals with this disorder often relapse, as defendant has in the past. Defendant's belief that she only drank alcohol in the past to cope with side effects

from medications would not produce a positive outlook on her chances of maintaining sobriety. Malis stated that alcohol counteracts the beneficial effects of psychotropic medications and can destabilize psychiatric issues. Additionally, there is a higher risk of suicide attempts and violence to others from individuals that abuse alcohol with a history of mental illness.

¶ 22    Malis opined that, if released, defendant is expected to inflict serious harm upon herself or others. He based this opinion on her index offense, history of driving under the influence of alcohol with another individual in her car, physical incidents with other patients, and suicide attempts following the murder of Magdalene and in November 2017 while in DHS custody. Malis stated that defendant's November 2017 suicide attempt consisted of her taking 30 Fioricet pills; a lethal amount of acetaminophen had defendant not thrown up. Malis disagreed with Dr. Watson's assessment that the suicide attempt was not the result of a mental illness.

¶ 23    The State next called Dr. Lesley Kane, Chief Psychologist for Du Page Probation and Court Services, to testify. Kane was appointed by the trial court to conduct an independent evaluation of defendant. Her evaluation was based on meeting with defendant for five hours and reviewing DHS treatment records. She diagnosed defendant with borderline personality disorder, other specified personality disorder with narcissistic traits, rule-out bipolar disorder with psychosis in remission, major depressive disorder with psychosis in remission, and alcohol use disorder. Regarding the borderline personality disorder diagnosis, Kane testified that someone with such a disorder may overreact to perceived slights or disagreements with another person and believe them bad or evil. She described defendant as having described feelings of being unfairly targeted by others, including DHS staff, that are beyond what would be considered normal. She opined that the severity of defendant's delusions waxed and waned.

¶ 24    Regarding defendant's November 2017 suicide attempt, Kane testified that, at the location of the attempt, defendant had written on the walls about DHS staff targeting, torturing, and treating her unfairly. Additionally, defendant had written a message to her daughter on the wall to sue DHS for wrongful death. Kane stated that suicide attempts are consistent with borderline personality disorder. She expressed concern that "if [defendant] is not in treatment or some form of treatment being monitored, *** there is the potential *** that she could harm herself." Kane believed defendant's potential for self-harm was greater on conditional release because less monitoring would occur.

¶ 25    Kane expressed concern about defendant's alcohol abuse disorder outside of a controlled environment. She testified that there was reason to still be concerned about an alcohol use relapse when defendant was no longer in a secured environment, and that alcohol use could exacerbate symptoms of her mental illness.

¶ 26    Kane testified that her biggest concern for defendant was that she was not recognizing the role mental illness played in her offending behavior. She opined that psychotropic medications of the kind defendant had refused to take helped her control her mental illness when they were being administered to her. She described defendant as more stable on medication and more insightful as to her mental health condition. Kane worried that, if released, defendant would struggle with the stresses of finding a place to live, supporting herself financially, and maintaining relationships. Additionally, she expressed concern that defendant would be unable to cope with, or even recognize, her symptoms in an outside environment.

¶ 27    It was Kane's recommendation that defendant continue inpatient treatment and opined that her symptoms would not improve without treatment. Kane believed defendant's underlying mental illness was the core issue preventing her from receiving necessary mental health treatment but

acknowledged that defendant may not receive that necessary treatment while in DHS. She did not think it was possible that defendant would see Dr. Malis for treatment and stated that defendant has shown more insight into her mental illness when taking medication. Kane testified that defendant's insistence that medication is the cause of all her issues makes her unable to address her problems and recognize the symptoms of her mental illness.

¶ 28    In rebuttal, defendant called Terry Nichols, a former nurse at Elgin Medical Health Center, to testify that he interacted with defendant while employed there and made notes on defendant's chart. He recalled noting a positive interaction with defendant following one of his shifts and made note of it in the chart. Nichols testified that Dr. Malis believed Nichols must be being manipulated and was not pleased with the positive note. Nichols testified that his supervisor explained to him that Dr. Malis wanted to compel medications for defendant through a court order and the positive notes in her chart would hinder that course of action.

¶ 29    On September 18, 2019, the trial court issued a memorandum opinion that it was considering defendant for conditional release. The trial court's order stated that

"The court, after reviewing all the testimony and reports regarding [defendant], concludes that it cannot agree with [defendant's] experts that she does not suffer from mental illness, clearly, she does. That fact by itself, however, does not automatically require continued confinement. The court also has difficulty with Dr. Malis's testimony as it is evident he will never acknowledge [defendant] is proper for release until she consents to the taking of psychotropic medications even though her psychosis has been in remission for over eight years without medication.

The court finds that the analysis of Dr. Kane is closest to what currently afflicts [defendant], basically borderline personality disorder. [Defendant] clearly needs to have

mental health treatment and therapy. The court, however, for reasons previously discussed, both of the fault of [defendant] and the fault of [DHS], will never receive that treatment while in the custody of the [DHS].

The court, in determining what would be proper treatment for [defendant], has again considered all evidence presented and the factors set forth in 730 ILCS 5/5-2-4(g). As to the statutory factors, the court finds:

1. [Defendant] does appreciate the harm she caused in the murder of her child and is burdened by her actions.

2. The court continues to have some concerns as to whether [defendant] completely understands that her prior conduct was caused by her developing mental illness and not merely caused by the medications she was taking at the time of the offense.

3. [Defendant's] prior psychotic episodes are now in remission and have been so for some time. Obviously, to date this has only been established in a secured environment. Since her confinement to the Elgin Mental Health Facility, [defendant] has shown an unwillingness to comply with the programs and counseling that DHS requires but, the problem is also, in part, due to the failure of DHS to even attempt to establish a transition program where [defendant's] conduct can be observed outside of the secured environment. Defendant has been granted no privileges at DHS.

4. [Defendant] refuses to take any medication for her mental illness and believes such medication caused her mental illness to begin with. That said, [defendant's] acute mental illness is in remission and has been for an extended period of time without medication.

5. The adverse effects of medication on the [defendant] are unidentifiable as she has refused any medication.

6. The question of [defendant's] mental health possibly deteriorating without medication cannot be assessed. As indicated, she has refused medication, however, having been off medication for a significant period of time, her psychotic features have remained in remission.

7. [Defendant] has some history of alcohol abuse, but it is also in remission while in a secured setting.

8. [Defendant] has a limited criminal history other than the crime for which she was found insane.

9. There is no evidence regarding any specialized physical or medical needs of [defendant].

10. [Defendant] has a mother and a sister in the area, but their participation or involvement with [defendant] if she were to be released, was not established.

11. Based on the findings of Dr. Kane, the court believes that [defendant] is not a danger to others. There was testimony that she may be a danger to herself based on the suicide episode in November of 2017 after this court's denial of her request for discharge or conditional release. The court believes this was solely based on the denial of discharge or conditional release at that time. As previously indicated, [defendant] continues to show irritability and aggressiveness, but no physically violent behavior has been shown toward staff or other patients. In fact, [defendant] has been the subject of abuse by other patients without retaliating. It is not possible to determine the dangerousness to herself unless a transition program is established to see how [defendant] conducts herself in unsecured environment situations.

It is the court's opinion that the evidence presented does not establish that [defendant] is in need of mental health services on an inpatient basis. At the same time, the

evidence does not establish that [defendant] is ready for discharge. The court believes that the proper course of action at this time is to formulate a plan for the [defendant's] conditional release from the Illinois Department of Human Services. The court believes that what has been discussed herein is that the Illinois Department of Human Services cannot provide for [defendant's] mental health treatment. [Defendant] needs to be in an environment where she will be able to work in conjunction with treating staff and not in opposition to them. If [defendant] cannot demonstrate an ability to do so, then this court would have to reconsider her placement."

The trial court then provided a list of conditions for defendant to meet before granting her conditional release. DHS was ordered to transfer defendant back to Chicago-Read.

¶ 30   On December 11, 2019, the trial court held a hearing to determine if defendant had met the requirements for conditional release. Defendant filed a memorandum detailing her plans for conditional release, and DHS filed a NGRI Interim Treatment Plan Report prior to the hearing. Defendant was unable to secure housing with outpatient facilities as she would not consent to medication. She was able to secure outpatient mental treatment and housing through legal and mental health advocates. She provided a lease for an apartment in Glen Ellyn and a bank account statement showing an account containing $10,000 deposited by Dr. Tasch. Defendant had secured the services of licensed clinical psychologist Dr. Laura Bauhof to provide further mental health treatment. Dr. Bauhof agreed to submit defendant's treatment progress reports to the trial court and DHS every 90 days. Dr. Bauhof further agreed to notify DHS of any violations by defendant of her conditional release.

¶ 31   DHS's NGRI Interim Treatment Plan Report stated that defendant's treatment team "remains concerned about her ability to manage stress and cope effectively with day-to-day

problems in living in the community." Additionally, the report stated that defendant "continues to be consumed by her antipathy toward DHS and its staff. She struggles to focus on very little else ***."

¶ 32    Following the trial court's review of the evidence presented at the December 11, 2019, hearing, defendant was granted conditional release for a period of five years and required to cooperate with mental health and counseling services, submit to random alcohol testing for at least six months, and have no unsupervised contact with any person under the age of 17. Defendant was released from the custody of DHS.

¶ 33    On December 20, 2019, this court granted the State's emergency motion to stay the trial court's conditional release order. Defendant was returned to DHS custody.

¶ 34    This appeal followed.

¶ 35                                II. ANALYSIS

¶ 36    The State contends that the trial court erred in finding that defendant should be released from inpatient treatment. The State argues that defendant failed to show that she is not a danger to herself or others.

¶ 37    Following an acquittal by reason of insanity, a defendant bears the burden of proving by clear and convincing evidence that a petition for conditional release or discharge should be granted. See 730 ILCS 5/5-2-4(g) (West 2018). The defendant's burden is to show by clear and convincing evidence that, due to his or her mental illness (regardless of whether it was enough to require involuntary admission), defendant is not reasonably expected to inflict serious harm upon defendant's self or another and would not benefit from further inpatient care or be in need of such inpatient care. Under a plain reading of the statute, if defendant proves either element, namely defendant is (1) not reasonably expected to inflict serious physical harm upon defendant's self or

another or (2) defendant would not benefit from inpatient care or is not in need of inpatient care, by clear and convincing evidence, the judge must grant the petition for conditional release. See 730 ILCS 5/5-2-4(a-1)(B) (West 2018). In determining whether a defendant should be released, the trial court should consider:

> "(1) whether the defendant appreciates the harm caused by the defendant to others and the community by his or her prior conduct that resulted in the finding of not guilty by reason of insanity;
>
> (2) Whether the person appreciates the criminality of conduct similar to the conduct for which he or she was originally charged in this matter;
>
> (3) the current state of the defendant's illness;
>
> (4) what, if any, medications the defendant is taking to control his or her mental illness;
>
> (5) what, if any, adverse physical side effects the medication has on the defendant;
>
> (6) the length of time it would take for the defendant's mental health to deteriorate if the defendant stopped taking prescribed medication;
>
> (7) the defendant's history or potential for alcohol and drug abuse;
>
> (8) the defendant's past criminal history;
>
> (9) any specialized physical or medical needs of the defendant;
>
> (10) any family participation or involvement expected upon release and what is the willingness and ability of the family to participate or be involved;
>
> (11) the defendant's potential to be a danger to himself, herself, or others; and
>
> (12) any other factor or factors the Court deems appropriate." 730 ILCS 5/5-2-4(g) (West 2018).

The trial court's determination as to whether a defendant has carried her burden under section 5-2-4(g) by clear and convincing evidence must be respected unless such determination is against the manifest weight of the evidence. *People v. Wolst*, 347 Ill. App. 3d 782, 790 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 38    A State may commit a person found not guilty by reason of insanity when that verdict establishes that (1) the defendant committed an act that constitutes a criminal offense and (2) the defendant committed the act because of mental illness. *Jones v. U.S.*, 463 U.S. 354, 363 (1983). A defendant found not guilty by reason of insanity may be confined to a mental health institution until such time as sanity is regained or defendant is no longer a danger to herself or others. *Jones*, 463 U.S. at 368. As a matter of due process, continued confinement of a harmless, mentally ill person is unconstitutional. *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992). In Illinois, a defendant found not guilty by reason of insanity in need of mental health services on an inpatient basis due to mental illness is defined as "a defendant who has been found not guilty by reason of insanity but who, due to mental illness, is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." 730 ILCS 5/5-2-4(a-1)(B) (West 2018). If the court finds that the defendant is no longer in need of mental health services, it shall order defendant's conditional discharge. 730 ILCS 5/5-2-4(h) (West 2018).

¶ 39    Here, the trial court's findings that defendant suffered from mental illness and that she is in need of inpatient care are not at issue. Rather, the issue is the State's argument that defendant did not show by clear and convincing evidence that she was not reasonably expected to inflict serious physical harm upon herself or others.

¶ 40    The trial court heard testimony from five expert witnesses who provided varying opinions as to whether defendant could reasonably be expected to inflict serious physical harm upon herself or others. Ultimately, the trial court found, based on the testimony of Dr. Kane, that [defendant] is not a danger to herself or others. See *supra* ¶ 26. The State argues throughout its brief that the testimony of Dr. Malis supports its proposition that defendant requires continued inpatient mental health treatment as Malis believes defendant to be delusional and a danger to herself and others if granted conditional release.

¶ 41    The trial court is in the best position to resolve the conflicts between the experts' testimony and determine their credibility. *Flynn v. Cohn*, 154 Ill. 2d 160, 169 (1992). When considering an appeal regarding the sufficiency of the evidence, this court will not retry the case. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). The trial judge in a bench hearing like the one at issue in the present case sits as the trier of fact: determining the credibility of witnesses, weighing the evidence, drawing inference from that evidence, and resolving conflicts in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). This court does not substitute its judgment for that of the trial court in making evidentiary determinations. *Best*, 223 Ill. 2d 350-51 (2006).

¶ 42    The trial court found Dr. Kane's analysis and diagnosis of defendant's mental health the most credible among the experts presented and based its findings on her testimony. Accordingly, while we will examine the trial court's findings on each statutory factor, we will focus our review of the trial court's findings as to whether defendant remains a danger to herself based on Kane's testimony.

¶ 43    As to the first two statutory factors (730 ILCS 5/5-2-4(g)(1), (2) (West 2018)), the trial court determined that defendant appreciates and is burdened by the harm she caused in murdering Magdalene. The trial court expressed concern that defendant does not completely understand that

the murder of her daughter was caused by her mental illness instead of the medications she was taking. We agree with the latter finding.

¶ 44    This court has had the opportunity to review the entire record in this case and noticed that defendant's murdered daughter's name, Magdalene, appears sparsely outside of the indictment where she is mentioned repeatedly. What is clear from our review of this case is that defendant has actively avoided any discussion of her daughter with her treating staff. Throughout the record, defendant blames—exclusively--withdrawal from psychotropic medications as the scapegoat for what happened to her four-year old girl. It appears that defendant's newly secured legal and mental health advocates share in defendant's approach to the cause of her underlying crime. This court will not speculate on the veracity of these beliefs regarding the discontinuation of psychotropic medications as the cause of what happened to defendant's daughter.

¶ 45    As to the third, fourth, fifth, and sixth statutory factors (730 ILCS 5/5-2-4(g)(3)-(6) (West 2018)), the trial court accepted Dr. Kane's diagnosis of defendant as suffering from borderline personality disorder and recognized that her prior psychotic episodes have been in remission since discontinuing medication. As such, the trial court recognized that any adverse effects of medication on defendant, or whether her mental health would deteriorate without medication could not be identified. The trial court acknowledged that Dr. Malis's belief that medication would be of benefit to defendant before being granted conditional discharge was problematic as "it is evident [Dr. Malis] will never acknowledge [defendant] is proper for release until she consents to the taking of psychotropic medications even though her psychosis has been in remission for over eight years without medication." However, Dr. Kane opined that defendant was more stable and insightful as to her mental condition when on medication.

¶ 46    Regarding the seventh statutory factor (730 ILCS 5/5-2-4(g)(7) (West 2018)), the trial court found defendant "has some history of alcohol abuse, but it is also in remission while in a secured setting." The trial court was presented with evidence that defendant has not consumed alcohol in over ten years and displayed no symptoms of alcohol addiction while in DHS custody. Defendant did complete treatment for alcohol abuse while in custody and participated in Alcoholics Anonymous meetings.

¶ 47    In making its determination under the eighth statutory factor, the trial court found defendant to have "a limited criminal history other than the crime for which she was found insane." (730 ILCS 5/5-2-4(g)(8) (West 2018)). The record shows defendant having been convicted for driving under the influence in 1998 and 2002. The State argues that this court should take issue with the trial court's finding on this factor and consider a 2007 altercation defendant had with a Walmart employee and a 2010 incident between her and another inmate in the Du Page County jail. Additionally, the State points to incidents noted in reports filed with the trial court by DHS detailing various incidents between defendant and other patients, as well as staff members. However, the State fails to explain to this court how those additional alleged incidents are indicative of "criminal history." We decline to reweigh the evidence on this statutory factor in the manner the State suggests.

¶ 48    The trial court found no evidence was presented regarding any specialized physical or medical needs of defendant. See 730 ILCS 5/5-2-4(g)(9) (West 2018). Our review of the record takes no issue with the trial court's determination on this statutory factor.

¶ 49    Regarding the tenth statutory factor (730 ILCS 5/5-2-4(g)(10) (West 2018)), the trial court found that defendant "has a mother and sister in the area, but their participation or involvement with [defendant] if she were to be released, was not established." The State argues that defendant

is alienated from her family but will not talk about it so it is unclear what role, if any, they will play if she is granted conditional discharge. Her father recently passed away. We agree with the State and the trial court that the amount of participation or involvement defendant will receive from her family was not established. Indeed, this court is concerned that this could be a problem for defendant upon conditional discharge. At the hearing on December 11, 2019, defendant presented the trial court with evidence of support from her legal and mental health advocates. They assisted her in securing an apartment and generous funds in her bank account. Additionally, her legal and mental health advocates helped defendant secure outpatient treatment as required by the trial court in its September 18, 2019, order.

¶ 50    The eleventh statutory factor requires the trial court to determine "the defendant's potential to be a danger to *** herself, or others[.]" 730 ILCS 5/5-2-4(g)(11) (West 2018). This factor is of particular import to this case as the determination of whether defendant can be expected to be a danger to herself or others is also a necessary element in the definition of someone who is in need of inpatient services. See 730 ILCS 5/5-2-4(a-1) (West 2018). Here, the trial court found

> "Based on the findings of Dr. Kane, the court believes that [defendant] is not a danger to others. There was testimony that she may be a danger to herself based on the suicide episode in November of 2017 after this court's denial of her request for discharge or conditional release. The court believes this was solely based on the denial of discharge or conditional release at that time. As previously indicated, [defendant] continues to show irritability and aggressiveness, but no physically violent behavior has been shown toward staff or other patients. In fact, [defendant] has been the subject of abuse by other patients without retaliating. It is not possible to determine the dangerousness to herself unless a

transition program is established to see how [defendant] conducts herself in unsecured environment situations."

This court finds defendant's November 2017 suicide attempt to be particularly concerning. The trial court found Kane's opinion as to this factor to be specifically credible. As such, we cannot agree that the trial court's finding that defendant is not a danger to herself is reasonable and supported by the manifest weight of the evidence. Kane testified as to her concerns about defendant's ability to cope with the stress of transition to the community and whether she would be properly monitored for symptoms of mental illness if granted conditional discharge. The trial court's reliance on Kane's opinion as the basis for its finding on this factor gives pause to this court, as Kane testified that she believed defendant should continue with inpatient treatment. But most importantly, the trial court agreed that Kane's diagnosis of borderline personality disorder was accurate as to defendant. Kane testified that suicide attempts were consistent with borderline personality disorder and further stated that those who have attempted suicide, like defendant, are more at risk of attempting suicide again and more at risk of succeeding on another attempt.

¶ 51    The trial court further stated in its findings that defendant "may be a danger to herself" based on her November 2017 suicide attempt but dismissed the attempt as "solely based on the denial of discharge or conditional release at the time." This court does not agree with the trial court that the defendant's November 2017 suicide attempt was solely based on the denial of her discharge petition, and we believe that defendant may remain a danger to herself. Kane testified that, in addition to the denial of the petition, defendant said she was worried that she could not provide for her children and believed her death could benefit her children through a wrongful death suit against DHS. Additionally, Kane testified that defendant had written on the walls during her suicide attempt, in a strikingly similar fashion to what she did in the bathroom where she murdered

Magdalene. Defendant had been saving up the Fioricet pills she used to attempt suicide for three years. Kane testified that this behavior raised concerns as to whether defendant had been planning to harm herself. The finding that defendant's November 2017 suicide attempt was based solely on the denial of her earlier discharge petition is not supported by the evidence presented. The trial court's reliance on Kane's diagnosis of borderline personality disorder makes its finding that defendant is no longer a danger to herself unreasonable and seems to selectively ignore Kane's testimony as a whole.

¶ 52    We concur with the trial court's statement that "[i]t is not possible to determine [defendant's] dangerousness to herself unless a transition program is established to see how the petitioner conducts herself in unsecured environment situations." However, we cannot agree that defendant should be granted conditional discharge based on the evidence presented. Again, the trial court parted ways with Dr. Kane's opinion that defendant needs further inpatient treatment after agreeing with her diagnosis of defendant as suffering from borderline personality disorder. In addition to Kane's concerns regarding defendant's November 2017 suicide attempt based on this diagnosis, she believed defendant's potential for self-harm was greater on conditional release because she would be monitored much less. She also expressed concern that defendant's alcohol abuse disorder, while in remission in a controlled environment, could be subject to relapse when no longer in a secure setting. She further testified that alcohol use could exacerbate defendant's mental health symptoms. Defendant herself expressed apprehension in her willingness to attend Alcoholics Anonymous meeting upon discharge because it reminds her of Magdalene as she used to take her to those meetings before she murdered her.

¶ 53    Throughout the proceedings below and evidenced in the many reports submitted by DHS, defendant has consistently exhibited combativeness and irritability when things do not go the way

she would like, including the suicide attempt after the denial of a previous petition for conditional release. The trial court accepted Dr. Kane's diagnosis of borderline personality disorder regarding defendant and this court accepts that diagnosis as well. Undoubtedly, defendant would face the same day-to-day problems and annoyances that every other person in our community faces. However, she and her mental health advocates choose not to address her underlying mental illness and continue to focus solely on her experience with psychotropic medication as the source of all her tribulations. This court fears she will not be able to fulfill the requirements of her conditional release as defendant has not even met DHS's requirements for off-unit privileges during her time as a patient.

¶ 54    To reiterate, defendant must prove by clear and convincing evidence that she is not reasonably expected to inflict serious physical harm upon herself or another or would not benefit from inpatient care or is not in need of inpatient care. See 730 ILCS 5/5-2-4(a-1)(B) (West 2018). This court's review of the record, along with the trial court's articulated findings and expert reliance, illustrates that defendant remains in need of inpatient hospitalization as no clear and convincing evidence was presented to support the notion that she would not reasonably be expected to inflict harm upon herself if granted conditional release. Based on the foregoing, the trial court's finding that defendant is not a danger to herself is not supported by the manifest weight of the evidence. This court agrees with the testimony presented by Dr. Kane that defendant needs further inpatient treatment to address her mental illness before being considered for conditional discharge.

¶ 55                                III. CONCLUSION

¶ 56    Accordingly, the judgment of the circuit court of Du Page County is reversed.

¶ 57    Reversed.